UNITED STATES of America, ex rel. David DARCY, Relator,

v.

Earl D. HANDY, Warden of Bucks County Prison, Dr. Fred S. Baldi, Warden of the Western State Penitentiary, Rockview, and Carl H. Fleckenstine, United States Marshal for the Middle District of Pennsylvania, Respondents.

No. 257.

United States District Court,
M. D. Pennsylvania.
Feb. 12, 1955.

Judgment Affirmed June 9, 1955.

272

Randolph Ryder, Asst. Atty. Gen., Frank P. Lawley, Deputy Atty. Gen., Frank V. Truscott, Atty. Gen., Donald W. Van Artsdalen, Doylestown, Pa., J. Julius Levy, U. S. Atty., Scranton, Pa., for respondents.

MURPHY, District Judge.

■ This case is here on remand,[1] a majority of the Court of Appeals having ruled that opportunity must be afforded relator to prove the allegations in his petition for habeas corpus, insofar as they relate to the alleged atmosphere of hysteria and prejudice prevailing at his trial, including any issues raised by Judge Boyer's asserted visits to the court room.[2] After a hearing was scheduled[3] respondent moved[4] to dismiss contending that the court lacked jurisdiction and judicial power to conduct the inquiry or to grant the writ. The motion is without merit. Similar questions were disposed of contrary to respondent's position in an opinion by Judge Goodrich speaking for the full court in United States ex rel. Elliott v. Hendricks, June 2, 1954,[5] 213 F.2d 922. See Id., at page

Charles J. Margiotti, Pittsburgh, Pa., Morton Witkin, Philadelphia, Pa., J. Dress Pannell, Harrisburg, Pa., Samuel Goldstein, Pittsburgh, Pa., for relator.

1. United States ex rel. Darcy v. Handy, (argued January 7, 1952; reargued December 1, 1952), 3 Cir., March 24, 1953, as amended March 28, 1953, 203 F.2d 407, rehearing denied April 29, 1953, certiorari denied Maroney v. United States ex rel. Darcy, October 26, 1953, 346 U.S. 805, 74 S.Ct. 103, 98 L.Ed. 375, mandate received November 4, 1953.

2. Cf. opinion Maris, J., Joined by Judges Goodrich and Staley, Id., 203 F.2d at page 420. We previously dismissed the petition because, in our judgment, its allegations were refuted by the record in the Pennsylvania courts. See United States ex rel. Darcy v. Handy, D.C.M.D.Pa., May 17, 1951, 97 F.Supp. 930, and see United States ex rel. Elliott v. Hendricks, 3 Cir., 213 F.2d 922, at pages 930, 931; Brown v. Allen, 1953, 344 U.S. 443, 457–458, 463, 73 S.Ct. 397–410, 97 L.Ed. 469; United States ex rel. Smith v. Baldi, 1953, 344 U.S. 561, 569, 570, 73 S.Ct. 391, 97 L.Ed. 549. A majority of the Court of Appeals agreed (see 203 F.2d 407, supra,) that there was no merit in relator's allegation of incompetency of his trial counsel, see United States ex rel. Thompson v. Dye, 3 Cir., March 26, 1953,

203 F.2d 429, certiorari denied May 18, 1953, 345 U.S. 960, 73 S.Ct. 946, 97 L.Ed. 1380; (cf. opinion of Chief Judge Biggs, joined in by McLaughlin, J., supra, 203 F.2d at page 410.)

3. Conference January 22, 1954; hearing set for February 17, 1954; continued because of illness of Mr. Margiotti to March 9, 1954; Mr. Van Artsdalen engaged before Grand Jury to February 11, 1954. Order March 5, 1954, to produce relator at hearing. Order November 5, 1953, staying execution of death penalty until court has acted upon and finally disposed of petition for writ of habeas corpus. Order March 12, 1954, striking jurors' letters from petition.

4. March 4, 1954. The alleged violation of the XI Amendment, United States Constitution, was first raised in respondent's petition for certiorari; denied 346 U.S. 865, 74 S.Ct. 103, 98 L.Ed. 375. See Note 1, supra.

5. Argued December 22, 1953. The Attorneys General of 40 states supported claim of the Attorney General of Pennsylvania of unconstitutionality. The United States Attorney General filed a brief contra.

929. "We cannot have any doubt, even were the question a new one, that the federal power is ample, under the Constitution, to authorize the use of habeas corpus procedure to test the question whether one confined under state process is, in that confinement, deprived of his rights under the Constitution of the United States. Nor have we doubt that the power may be assigned to all the federal judiciary or part of it. If the authority of federal courts is to be more limited than that provided by the present statute, that limitation must be made by the Congress." And see Mr. Justice Reed in Brown v. Allen, supra, 344 U.S. at pages 460, 464, 478, 486, 73 S.Ct. at pages 408, 409, 411, 418, 422, and Mr. Justice Frankfurter, Id., 344 U.S. 443, at page 508, 73 S.Ct. 437, at page 447, "Congress has the power to distribute among the courts of the States and of the United States jurisdiction to determine federal claims. It has seen fit to give this Court power to review errors of federal law in State determinations, and in addition to give to the lower federal courts power to inquire into federal claims, by way of habeas corpus". Id., 344 U.S. 510, 73 S.Ct. 448, "Insofar as this jurisdiction enables federal district courts to entertain claims that State Supreme Courts have denied rights guaranteed by the United States Constitution, it is not a case of a lower court sitting in judgment on a higher court. It is merely one aspect of respecting the Supremacy Clause of the Constitution whereby federal law is higher than State law. It is for the Congress to designate the member in the hierarchy of the federal judiciary to express the higher law. The fact that Congress has authorized district courts to be the organ of the higher law rather than a Court of Appeals, or exclusively this Court, does not mean that it allows a lower court to overrule a higher court. It merely expresses the choice of Congress how the superior authority of federal law should be asserted."

See Mr. Justice Black, 344 U.S. at page 549, 73 S.Ct. at page 431, "I agree with the Court that the District Court had habeas corpus jurisdiction * * * including power to release * * * if [the prisoner is] held as a * * * violation of constitutional rights. This I understand to be a reaffirmance of the principle embodied in Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543." [6]

Has the applicant met the burden of showing that he has exhausted the remedies available in the state courts within the meaning of 28 U.S.C.A. § 2254; Darr v. Burford, 339 U.S. 200, at page 218, 70 S.Ct. 587, 94 L.Ed. 761; Brown v. Allen, 344 U.S. at pages 448–450, 486, 487, 73 S.Ct. at pages 402–404, 422, supra? Respondent argues that the Pennsylvania Supreme Court did not directly meet and dispose of the question of hysteria and prejudice. See Commonwealth ex rel. Darcy v. Claudy, April 10, 1951, 367 Pa. 130, 79 A.2d 785.

The Court of Appeals, however, found contra. See opinion C. J. Biggs, supra, 203 F.2d at page 411, describing the opinion in 367 Pa. 130, 79 A.2d 785, as "passing on every substantial ground alleged in the petition." [7] See and cf. Brown v. Allen, supra, 344 U.S. at page 458, 73 S.Ct. at pages 407, 408; United States ex rel. Smith v. Baldi, February 9, 1953, 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549; Commonwealth ex rel. Elliott

6. See sentiments of Judge Goodrich, United States ex rel. Smith v. Baldi, 3 Cir., 1951, 192 F.2d 540, 543; Mr. Justice Jackson, Brown v. Allen, 344 U.S. at page 532, 73 S.Ct. at page 423; Mr. Justice Reed, Darr v. Burford, 1950, 339 U.S. 200, at page 217, 70 S.Ct. 587, at page 597, 94 L.Ed. 761, and see Report Committee on Habeas Corpus of Judicial Conference of United States, July 16, 1954, supplement September 16, 1954, and recommended legislation. Report of Special Committee on Habeas Corpus to the Conference of Chief Justices, June 1953.

7. As to Judges McLaughlin (see Id., 203 F. 2d 419), Kalodner and Hastie (at page 420), Maris, (at pages 420–428). Goodrich and Staley. Id.

v. Baldi, April 14, 1953, 373 Pa. 489, 96 A.2d 122, certiorari denied June 8, 1953, 345 U.S. 976, 73 S.Ct. 1125, 97 L.Ed. 1391.

■ A remedy may be exhausted by affirmative use thereof and failure therein or by inaction or failure to resort thereto.

■ Assuming arguendo there was some evidence of hysteria and prejudice before or at the trial, the law of Pennsylvania affords a number of methods of raising the question and spelling it out on the record and in the event of an adverse decision reserving it for review on appeal to the Supreme Court of Pennsylvania and on certiorari to the United States Supreme Court. Pre-trial, by challenging the array, see Commonwealth v. Zell and Herr, 81 Pa.Super. 145, at page 150, or by motion for continuance, Commonwealth v. Balles, 160 Pa.Super. 148, 150–151, 50 A.2d 729, or change of venue, Commonwealth v. Karmendi, 328 Pa. 321, 339, 342, 195 A. 62. The Pennsylvania Supreme Court itself could upon proper showing remove the indictment to another county for trial, Commonwealth v. Ronemus, 205 Pa. 420, 54 A. 1095. At trial, by motion for withdrawal of juror, Commonwealth v. Mehlman, 163 Pa.Super. 534, 544, 63 A.2d 400. Post-trial, by motion for new trial, Commonwealth v. Deni, 317 Pa. 289, 293, 176 A. 919. Finally, on appeal and on petition for certiorari to the United States Supreme Court.

No such question was suggested either before, during or after the trial. See Rel.Ex.Nos. 4, 5, 10, 115, 116, 137; the motion for a new trial and opinion denying same; the assignments of error and statements of question involved on appeal, see paper books Supreme Court of Pennsylvania, 362 Pa. 259–286; Commonwealth v. Darcy, May 26, 1949, 362 Pa. 259, 66 A.2d 663, rehearing refused June 24, 1949.

The petition for certiorari (No. 96 Misc.), denied October 1949, 338 U.S. 862, 70 S.Ct. 96, 94 L.Ed. 528, raised only questions as to the jury view of the locus in quo and the charge of the court on presumptions from the use of a deadly weapon.

August 1, 1949, relator petitioned the Supreme Court of Pennsylvania for a writ of habeas corpus complaining that at the trial, over objection, the jury heard testimony as to offenses committed by defendant other than that named in the indictment. Petition denied without opinion August 12, 1949 (not reported); certiorari denied (No. 102 Misc.) October 23, 1949, 338 U.S. 862, 70 S.Ct. 96, 94 L.Ed. 528.

The question was not raised until after the relator failed in his attempt to have the Pennsylvania Board of Pardons commute his sentence to life imprisonment. (April 1950, denied May 5, 1950; application for reargument granted June 1950, continued to March 20, 1951, rejected March 21, 1951; again on March 29, 1951, rehearing denied March 30, 1951). April 2, 1951, relator's petition to the Supreme Court of Pennsylvania for certiorari to the Court of Oyer and Terminer of Bucks County, and for reargument nunc pro tunc, claimed denial of due process of law alleging that his trial counsel did not permit him to testify at his trial, (cf. opinion Biggs J., 203 F.2d at page 410, Maris J. at page 420); did not produce witnesses as to his background, good behavior, character or reputation although they were available; the proximity of the two trials; jurors' letters and opinions; hysteria; Judge Boyer's commendation and participation; and failure to continue the case. Denied without opinion April 3, 1951 (No. 429 Misc., Docket No. 9). Relator did not seek certiorari from the United States Supreme Court.

April 3, 1951, the present petition was filed in the district court. We withheld ruling thereon to afford relator an opportunity to seek a writ of habeas corpus from the Supreme Court of Pennsylvania, raising the precise questions and, if he failed therein, to seek certiorari from the United States Supreme Court. The petition filed April 9, 1951, was denied April 10, 1951, Commonwealth ex rel.

Darcy v. Claudy, 367 Pa. 130, 79 A.2d 785.[8]

Application for certiorari filed June 12, 1951; denied October 8, 1951, 342 U.S. 837, 72 S.Ct. 61, 92 L.Ed. 632.

In his petition for certiorari filed June 12, 1951, relator's counsel at p. 7 states "All these facts were ascertained as a result of investigation by present counsel of the Petitioner and were presented to the Supreme Court of Pennsylvania for the first time in the Petition for Writ of Habeas Corpus which it refused on April 10, 1951." [9] And at p. 3, " * * * former counsel of petitioner either failed to set forth said additional reasons or were unaware of the said additional reasons which for the most part were the result of investigation by present counsel". And see Id. p. 12, " * * * former counsel, employed after the petitioner's conviction and prior to the employment of present counsel, either failed to include * * * or perhaps were unaware of the facts. * * *"

■ Res adjudicata does not apply, Salinger v. Loisel, 265 U.S. 224, at page 230, 44 S.Ct. 519, 68 L.Ed. 989, see and cf. Brown v. Allen, supra, 344 U.S. at page 458, 73 S.Ct. at pages 407, 408, and Price v. Johnston, 334 U.S. 266, at page 291, 68 S.Ct. 1049, at page 1063, 92 L.Ed. 1356, "If for some justifiable reason he was previously unable to assert his rights or was unaware of the significance of relevant facts, it is neither necessary nor reasonable to deny him all opportunity of obtaining judicial relief." But cf. Id., 334 U.S. at page 289, 68 S.Ct. at page 1062, Wong Doo v. United States, 265 U.S. 239, 44 S.Ct. 524, 68 L.Ed. 999, and see dissent 334 U.S. at pages 296, 297, 68 S.Ct. at pages 1065, 1066; Darr v. Burford, supra, 339 U.S. at page 203, 70 S.Ct. at page 589; Brown v. Allen, supra, 344 U.S. at page 461, 73 S.Ct. at page 409, "Liberal as the courts are and should be as to practice in setting out

claimed violations of constitutional rights, the applicant must meet the statutory test of alleging facts that entitle him to relief."

A majority of the Court of Appeals rejected relator's claim of inefficient representation by trial counsel. This being so, if the situation were as obvious as relator now contends it must have been equally obvious to his trial counsel.

"This is not the case of an accused who has been denied counsel and who has failed to assert his constitutional rights at the proper time because of ignorance, but of one who has had the assistance of able counsel who knew how to raise and would have raised upon the original trial the questions that he is now raising, if there had been any substance to them." Crowe v. United States, 4 Cir., 1949, 175 F.2d 799, at page 801.

■ "The writ of habeas corpus in federal courts is not authorized for state prisoners at the discretion of the federal court. It is only authorized when a state prisoner is in custody in violation of the Constitution of the United States. 28 U.S.C. § 2241. That fact is not to be tested by the use of habeas corpus in lieu of an appeal. To allow habeas corpus in such circumstances would subvert the entire system of state criminal justice and destroy state energy in the detection and punishment of crime." Mr. Justice Reed, Brown v. Allen, supra, 344 U.S. at page 485, 73 S.Ct. at page 421.

"If defenses may be omitted at trials, rights of review omitted, and yet availed of through habeas corpus, the whole course of criminal justice will be deranged, and, it may be, defeated." Ex parte Spencer, 228 U.S. 652, at page 661, 33 S.Ct. 709, at page 711, 57 L.Ed. 1010, and see In re Wood, 140 U.S. 278, at page 290, 11 S.Ct. 738, 35 L.Ed. 505.

■ "Evidence in state criminal proceedings to support objections on federal constitutional grounds, known to state

---

8. After we dismissed relator's petition, on appeal the Court of Appeals allowed a stay of execution. See Note 1 supra.

9. But see petition April 2, 1951.

defendants and their counsel, or easily ascertainable, cannot be withheld or neglected at the state trial and used later to support habeas corpus. State criminal proceedings would be unreasonably hampered." Brown v. Allen, supra, 344 U.S. at page 480, 73 S.Ct. at page 419, footnote 24.

■ Mr. Justice Reed, "Failure to appeal is much like a failure to raise a known and existing question of unconstitutional proceeding or action prior to conviction or commitment. Such failure, of course, bars subsequent objection to conviction on those grounds." Id., 344 U.S. at page 486, 73 S.Ct. at page 422, and see Id., 344 U.S. at page 487, 73 S.Ct. at page 422. " * * * failure to use a state's available remedy, in the absence of some interference or incapacity * * * bars federal habeas corpus."

As to the "broad reach" given to federal habeas corpus by recent cases, see Mr. Justice Jackson in Brown v. Allen, supra, 344 U.S. at pages 532, 533, 73 S.Ct. at page 423. "Once upon a time the writ could not be substituted for appeal or other reviewing process but challenged only legal competence or jurisdiction of the committing court. We have so departed from this principle that the profession now believes that the issues we actually consider on a federal prisoner's habeas corpus are substantially the same as would be considered on appeal." Id., 344 U.S. at page 540, 73 S.Ct. at page 427.

"Most states, and with good reason, will not suffer a collateral attack such as habeas corpus to be used as a substitute for or duplication of the appeal. A state properly may deny habeas corpus to raise either state or federal issues that were or could have been considered on appeal. Such restriction by the state should be respected by federal courts." Id., 344 U.S. at page 541, 73 S.Ct. at page 427.

As to the scope of review and possible relief on habeas corpus generally, see Commonwealth ex rel. Elliott v. Baldi, supra, 373 Pa. 489, at pages 492, 495, 96 A.2d 122; Commonwealth ex rel. Carey v. Montgomery County Prison Keeper, 370 Pa. 604, 88 A.2d 904; Commonwealth ex rel. McGlinn v. Smith, 344 Pa. 41, 24 A.2d 1. See and cf. Woods v. Nierstheimer, 328 U.S. 211, 66 S.Ct. 996, 90 L.Ed. 1177; Dowd v. United States ex rel. Cook, 340 U.S. 206, 71 S.Ct. 262, 95 L.Ed. 215; Bowen v. Johnston, 306 U.S. 19, at pages 23, 24, 59 S.Ct. 442, 83 L.Ed. 455; finally, Waley v. Johnston, 316 U.S. 101, 104–105, 62 S.Ct. 964, 86 L.Ed. 1302.

Mr. Justice Frankfurter, Brown v. Allen, supra, 344 U.S. at page 503, 73 S.Ct. at page 444, "Of course, nothing we have said suggests that the federal habeas corpus jurisdiction can displace a State's procedural rule requiring that certain errors be raised on appeal. Normally rights under the Federal Constitution may be waived at the trial. Adams v. United States ex rel. McCann, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268, and may likewise be waived by failure to assert such errors on appeal. Compare Frank v. Mangum, 237 U.S. 309, 343, 35 S.Ct. 582, 593, 59 L.Ed. 969."

"When a State insists that a defendant be held to his choice of trial strategy and not be allowed to try a different tack on State habeas corpus, he may be deemed to have waived his claim and thus have no right to assert on federal habeas corpus. * * * *However, this does not touch one of those extraordinary cases in which a substantial claim goes to the very foundation of a proceeding* [Italics supplied], as in Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543. Cf. Ex parte Lange, 18 Wall 163, 21 L.Ed. 872; Ex parte Royall, 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed 868." Id., 344 U.S. at page 503, 73 S.Ct. at page 444. Is this such a case?

■ In view of the mandate we of necessity deferred answering this question until relator was afforded an opportunity to present evidence in support of his allegations. The burden of proving facts inconsistent with judicial records in all proceedings of this kind is heavy. Brown v. Allen, supra, 344 U.S. at page

507, 73 S.Ct. at page 446. Petitioner must "allege and prove primary facts, not inferences, that show, notwithstanding the strong presumption of constitutional regularity in state judicial proceedings, that * * * the state so departed from constitutional requirements as to justify * * * intervention to protect the rights of the accused." Darr v. Burford, supra, 339 U.S. at page 218, 70 S.Ct. at page 597; Johnson v. Zerbst, 304 U.S. 458, at page 468, 58 S.Ct. 1019, 82 L.Ed. 1461; Hawk v. Olson, 326 U.S. 271, at page 279, 66 S.Ct. 116, 90 L.Ed. 61.

A hearing was held with relator present on March 11, 12, 13, 16, 17, 18, 19 and 20, 1954. Relator called 22 witnesses and offered 137 exhibits; respondent 11 witnesses, 6 exhibits. In addition we have before us the record of proceedings in the state and federal courts.[10]

■■■ Although afforded opportunity by the court to testify relator declined to do so. N.T.–H. 614–617. Next day relator's counsel took exception to the questions propounded by the court, alleging relator was compelled to make statements he was not required to make by the United States Constitution. See Id. 723, 725. The exception is without merit. A habeas corpus hearing is not a criminal proceeding. See United States ex rel. Sholter v. Claudy, 3 Cir., 1953, 203 F.2d 805, 806, 807.

About 11:25 P.M., December 22, 1947, David Darcy, 22, Harold Foster, 23, Harry Zeitz, 18, and Felix Capone, 16, arrived at the Feasterville Tavern located at the junction of Churchville-Newtown-Bustleton Roads, in the Village of Feasterville, Lower Southampton Township, Bucks County, Pennsylvania.[11] Darcy, Foster and Zeitz, each armed with a revolver,[12] entered the tavern while Capone acted as a "lookout" in an automobile parked nearby with the engine running for a quick getaway. During the course of the robbery Darcy fired two shots and then engaged in a scuffle with Allen Hellerman and Edward Wunsch. During the scuffle Darcy, Zeitz and Foster fired shots. Hellerman fell to the floor, shot in the base of the neck and paralyzed in both lower extremities.[13] Two shots struck Wunsch causing arm and shoulder injuries. After taking the money from the cash register, Foster demanded that everyone produce their wallets. Darcy said he felt "like shooting someone", and again, "Where is the police? I feel like shooting some of them". N.T.–T. 304. Darcy then threatened several patrons with his gun, lined them up against the wall with their hands up and demanded their watches. While Foster was "covering" those present, Darcy and Zeitz reloaded their guns. After robbing the proprietor and some 18 patrons, with Hellerman lying on the floor "apparently dead" they fired shots into the mouthpiece of the telephone, warned those present not to move for a long time, and departed, Foster returning momentarily as a warning and to wish them all a "Merry Christmas".

10. May 28, 1954, petition by relator to re-open hearing to clarify some evidence. June 12, respondent moved to dismiss. June 28, after relator's counsel did not appear at the hearing, opportunity was afforded to file affidavits. See 28 U.S.C.A. § 2246; United States ex rel. Darcy v. Handy, supra, 203 F.2d at page 429. After the testimony was filed October 8, 1954, and examined together with the affidavits and the law, the petition to re-open was denied November 10, 1954. See note 30, infra, and see United States v. Willis, 3 Cir., 217 F.2d 941. December 3, 1954, was set as the time for argument, findings of fact and conclusions of law. November 26, 1954, counsel for relator's oral motion for continuance was denied.

11. They left Philadelphia (Frankford section) about 10:30 in a two-door 1939 Plymouth sedan owned and driven by Zeitz. N.T.–T. pages 815–816.

12. 32.20 French mfr.; 32 Caliber, Richardson & Harrington; 38 Caliber, Smith & Wesson, used on all holdups, stolen by Capone from his home. N.T.–T. 824. Id. 746, 847–848.

13. N.T.–T. 726. Critically ill for sometime; appeared as a Commonwealth witness in a wheelchair; since deceased. N.T.–H. 895.

278

Meanwhile, a Mrs. Leutwyler got out a rear door, ran across the road to the Buck Hotel and gave the alarm. At the hotel she found the bartender and two other persons, William Kelly and Frank J. Walter. They followed her outside and stood at the road intersection. While there Horace Patterson, a friend of Kelly, drove out of Churchville Road and stopped to talk with him and Walter. They noticed the automobile, with the engine running, standing in front of the Feasterville Tavern headed toward Newtown. Darcy, Foster and Zeitz ran from the tavern, got into the car and started off with Zeitz at the wheel. Just then, one of Zeitz' companions said: "Someone is coming out the door". Zeitz fired two shots, from a gun held in his left hand, from the front window of the driver's side in the direction of Kelly who was then some ten or twenty feet away. One of the bullets struck Kelly in the back of the head causing his death within two days.

A half hour after Zeitz fired the shots, Darcy and his three companions committed another armed robbery of the proprietor and three or four patrons of the Deacon Inn near Penndel, eight miles away from the Feasterville Tavern. Darcy said, "Stop the fooling around. This is a stickup. We just killed a couple of guys." N.T.–T. 685. Capone, with gun in hand, said, "You guys ought to try this sometime, it's fun." N.T.–T. 688. Three shots were fired, two of them into the telephone booth; no one was injured. Upon their return to Philadelphia at 1:17 A.M. December 23, 1947, they were apprehended by Philadelphia police.[14]

That same day all four made a statement to the police voluntarily admitting their participation in the Feasterville Tavern and Deacon Inn robberies (CX–69, N.T.–T. 814), and statements as to having committed seven other robberies since November 30, 1947, using the same automobile and guns and a plan, pattern and scheme similar to that used on December 22, 1947—three in New Jersey, four in the Bucks-Philadelphia Counties area.[15] Altogether seven patrons were shot or otherwise injured.[16]

14. See and cf. Doylestown Daily Intelligencer. Rel. Ex. Nos. 12 and 13. Newtown Enterprise, January 1, 1948. Ex. Nos. 107, 108.

15. (a) November 30, 1947, 2:55 A.M., Ralph & Jim's Cafe, Waterford, N. J. Darcy and Zeitz fired two shots into the floor. Capone was unarmed. N.T.–T. 841; see Com. Ex. CX–71. (b) December 3, 1947, 11:15 P.M., Mary's Tavern, Maple Shade, N. J. Darcy, Foster and Capone entered armed; Zeitz acted as "lookout". N.T.–T. 846, Com. Ex. CX–71. (c) December 3, 1947, 1:50 A.M., Old Coin Inn, Hammonton, N. J. Foster, Zeitz and Capone armed; Zeitz fired one shot and pulled telephone receiver from the wall. N.T. Foster-Zeitz trial, p. 1221. Com. Ex. CX–71. (d) December 6, 1947, 1:50 A.M., Bell's Corner Tavern, 8300 Bustleton Avenue, Rhawnhurst, Pa. Foster and Zeitz entered armed; Capone acted as "lookout". During scuffle three patrons, Arthur Coffin, a city fireman, was shot through the chest and abdomen, George Klinger shot through the right leg, and Walter Watten suffered a gashed hand trying to grab one of the guns. Hurrying to make a getaway, the attempted robbery was frustrated. N.T. Foster-Zeitz trial, p. 1239, Com. Ex. CX–74. (e) December 9, 1947, Poplars Inn, Lincoln Highway. Zeitz and Capone remained in car; Foster entered armed; only one person being present in the inn. N.T. Foster-Zeitz trial, p. 1226. Com. Ex. CX–72. (f) December 13, 1947, 1:00 A.M., Wolf's Tap Room, Elkins Park, Pa. Darcy, Foster and Capone armed. Darcy scuffled with a patron, his gun went off; the man was injured. Capone fired three shots into the wall. N.T.–T. 849. Com. Ex. CX–73. (g) December 17, 1947, 1:50 A.M., Pulokas Inn, McDade Blvd., Woodlynn, Pa. Zeitz and Foster entered armed; Capone acted as "lookout". Zeitz fired one shot into the ceiling. N.T. Foster-Zeitz trial, p. 1212. Com. Ex. CX–70. The Commonwealth agreed that Capone's statement in CX–71 about being picked up in New Jersey with a stolen car did not involve Darcy. It was eliminated in the Darcy trial and the jury so instructed. N.T.–T. 857.

16. Darcy participated in the Feasterville and Deacon Inn and three of the other seven robberies. See Note 15(a), (b),

Because of Kelly's death on Wednesday, December 24, all four were held without bail December 26 by Magistrate William Hogan in Philadelphia. Meanwhile their transfer to the Bucks County authorities was delayed by weather conditions. At the hearing Lt. John Hanlon of the Philadelphia police testified as to their admissions.[17]

Monday, January 5, 1948, all four were brought to Bucks County, charged with murder and committed without bail by Justice of the Peace Horace A. Cooper at Langhorne to the Bucks County prison to await action by the Grand Jury February 9, 1948. The Commonwealth was represented by Assistant District Attorney Willard Curtin; Zeitz by I. Louis Rubin, Esq. Coroner's physician Dr. John C. Simpson testified as to the cause of death; Chief County Detective Anthony Russo as to signed statements by the defendants. The possible penalty was not mentioned.[18]

Tuesday, January 27, 1948, a coroner's inquest, upon hearing testimony of Dr. John C. Simpson, coroner's physician, decided that death was caused by a gun shot wound; Pvt. Kenneth R. Dane, Pennsylvania State Police, testified that Zeitz admitted firing two shots in Kelly's direction. The possible penalty was not mentioned.[19]

January 29, 1948, transcript filed, Clerk of the Courts office, Ex. Nos. 1 and 4; Rel. Ex. No. 10, Oyer and Terminer Criminal Docket, p. 320; Ex. No. 115 Criminal Minutes, Docket 1948 to ——, p. 7; Ex. No. 137, Criminal Minutes, Docket 1943 to ——, p. 379.

February 6, 1948, the District Attorney was reported as stating that the murder case was scheduled for action by the Grand Jury February 9, 1948, but the trial would in all probability be continued until the May term.[20]

February 10, 1948, defendants being present (Zeitz represented by I. Louis Rubin, Esq., Darcy by Webster S. Achey, Esq., Capone by Frederick Smith, Esq.) Judge Keller charged the Grand Jury for ten minutes and approved submitting the case to the Grand Jury for action.[21] Six witnesses appeared. 10:55 A.M. all four defendants were jointly indicted to No. 37 February Sessions 1948 for murder. Rel.Ex.No. 2.

The District Attorney then moved for a continuance until the May Term because of the critical condition of Allen Hellerman (a Commonwealth witness) and because Harold Foster was without counsel. The continuance was granted. Rel. Ex. Nos. 116, 137, p. 379.

March 1, 1948, Webster S. Achey, Esq., on Darcy's behalf and Frederick Smith, Esq., for Capone, moved for a severance and separate trials.[22] It was reported[23] that the court commented "Separate trials * * * will mean that it may take a year to dispose of the cases", and suggested to counsel the advisability of a combination trial as to all defendants, but counsel insisted on their legal rights. Judge Keller granted the motions. Rel. Ex. Nos. 1, 4, 10, p. 320.

March 3, 1948, Judge Boyer appointed Donald B. Smith, Esq. and William Freed, Esq., as counsel for Harold Foster.[24] Rel.Ex.No. 10, p. 321. Id. Ex. Nos. 1 and 4. Id. Ex. No. 45.

---

(f). Only Exs. 69, 73 and part of 71 were received at his trial. Upon objection by defense counsel part of Ex. 71 was excluded with cautionary instructions. N.T.–T. 845–846. See and cf. Rel. Ex. Nos. 14, 15.

17. See and cf. Rel. Ex. Nos. 16 and 17, 18 and 19, 21.

18. See and cf. Rel. Ex. Nos. 23 and 24.

19. See and cf. Rel. Ex. Nos. 28 and 29.

20. See and cf. Rel. Ex. Nos. 34 and 35.

21. Ex. No. 10, p. 314. See and cf. Rel. Ex. Nos. 36 and 37.

22. Act March 31, 1860, P.L. 427 § 40 (Pa.) 19 P.S. § 785.

23. Rel. Ex. Nos. 43 and 44.

24. Act March 22, 1907, P.L. 31 and § 1, as amended April 6, 1949, P.L. 406, § 1, Pa. 19 P.S. § 784. See Commonwealth v. Thompson, supra, 367 Pa. 102, 79 A.2d 401. Rel. Ex. No. 45.

There were only two attorneys in the District Attorney's office in Bucks County at that time, Edward G. Biester, and his assistant, Willard S. Curtin. While both were engaged in murder cases other cases could not be disposed of without difficulty. The murder cases had already been continued from the February term. Allen Hellerman, a witness, was in serious physical condition. The District Attorney decided in the interests of justice [25] that the cases should be tried as promptly as possible.

At a conference in early March 1948 defense counsel were advised that the Foster-Zeitz case would be called first for trial; the Darcy case the following week; then Capone. May 17, 1948, the Capone case was continued; [26] the trial list prepared for the May term and counsel for Darcy again notified that the Darcy case would be called for trial the week following the Foster-Zeitz trial which was first on the list; the precise date of commencing the Darcy trial depending upon the date of completion of the Foster-Zeitz trial.[27] Subpoenas for the Darcy trial were sent out the end of the week of May 24 or early in the week of June 1.

April 12, 1948, a venire was ordered, Rel. Ex. No. 8, for the empaneling and summoning of 120 jurors for service "At the term * * * commencing on the 17 day of May * * * 1948 * * to serve for the term (sic) thereof commencing on the 24 day of May * * * 1948". Simultaneously Rel.Ex.No. 9 called for 120 " * * * to serve for the term (sic) * · * * commencing on the 1 day of June 1948". On the return of the writ the sheriff certified, Rel. Ex. Nos. 6 and 7, that the persons named were summoned to appear in court at 9:45 A.M. on May 24 and June 1, respectively.[28] Ordinarily the jurors, unless previously excused by Judge Keller, would report on the date directed. However, when it became apparent that the Foster-Zeitz trial would continue into the week of June 1, the court directed the sheriff's office to notify verbally all who had been summoned for jury duty as of Tuesday, June 1, 1948, not to appear until Monday, June 7, 1948. They were so notified and did not appear for duty until June 7 as directed.[29] [30]

25. See Act March 31, 1860, P.L. 427, § 54 (Pa.) 19 P.S. § 781, "Two Term Rule". " * * * unless the delay happen on the application or with the assent of the defendant * * *". P.S. Pa. Constitution, Art. 1, § 9, " * * * a speedy public trial by an impartial jury of the vicinage * * *." Cf. 130 F.Supp. 277, supra.

26. Rel. Ex. No. 10, p. 387, continued February 12, May 17. Arraigned and plead guilty September 29, Frederick Smith, Esq., Edward Kelly, Esq., Philadelphia, for defendant. Received testimony of Foster-Zeitz trial, Commonwealth's witnesses, defendant's witnesses. Case continued (see Rel. Ex. Nos. 10, 115, p. 50). Argument court, February 9, 1949, case continued on account of illness of Edward H. Kelly, Esq.; April 11, 1949, case continued from June 8, 1949, to June 17, 1949. Ex. No. 10, p. 449, Hon. Fred W. Davis, 43rd Judicial District, specially assigned. June 17, 1949, Commonwealth's witnesses, defendant's witnesses, and argument. September 6, 1949, defendant guilty of murder first degree, imprisonment for life. September 7, 1949, sentence.

27. See and cf. Rel. Ex. Nos. 51, 52, May 14, 1948, " * * * only two will be tried during the approaching term * * * Darcy and * * * Capone will be tried later." Ex. Nos. 55 and 56, May 24, 1948, "Only two of the defendants charged with the murder will go on trial this term * * * The other two defendants * * * will be tried at a later term of court." But see Rel. Ex. No. 64, May 28, "at a later date"; No. 65, May 29, "tried later"; Capone, Rel. Ex. Nos. 70, 91, 99, "not until September".

28. See Rel. Ex. No. 137, p. 391–392, Foster-Zeitz panel, and see Rel. Ex. Nos. 53, 54 and 123A (Quakertown Free Press, May 27), Darcy (Id. 393) panel, Rel. Ex. No. 55 and see No. 123B.

29. Members of the May 24 panel served during the week of June 1 (Rel. Ex. No. 10, p. 334, Ex. No. 137, p. 401)—June 2, 3, 4. No names in the Foster-Zeitz

30. See note 30 on following page.

In each trial jurors waiting in the Grand Jury room were called individually into the main court room; carefully and searchingly examined on voir dire. In each trial a fair and impartial jury of twelve and two alternates was obtained.[31] It took more time to select a jury in the Foster-Zeitz case; each defendant had twenty peremptory challenges;[32] each a separate independent examination; two extra venires were called.[33][34] Foster and Zeitz each exercised sixteen peremptory challenges; the Commonwealth thirteen; challenged for cause or excused were thirty-seven with conscientious scruples, seventeen for illness, physical defects, home conditions, etc., thirteen clients of counsel engaged in

---

panel were included in the Darcy panel. Juror Wm. H. Slaughter, N.T.-T. 218, a former night watchman at the Bucks County Home, acquainted with all the attorneys in the Darcy case, attended sessions "off and on" on several days of the Foster-Zeitz trial. There is no evidence that he was in court on June 1. He was excused from the Darcy case for cause. See colloquy N. T. p. 220 as to whether or not such presence per se was a disabling cause.

See and cf. Rel. Ex. No. 10, p. 331, "Eo Die—1948 June 1—Court called at Ten O'Clock A.M. Hon. Hiram H. Keller, P.S. and Hon. Calvin S. Boyer J. presiding.

Eo Die—List of Traverse Jurors Summoned and Returned by the Sheriff to the May Term of Criminal Court A.D. 1948 (second week) * * *."

Id. at 332, "Eo Die—The Second Week Traverse Jurors Having Been Called, All Answered to Their Names But the Following * * *" See Rel. Ex. No. 137, p. 393, Ex. No. 9 is spelled out, then "1948 June 1—List of Traverse Jurors Summoned by the Sheriff and Returned to May Term of Criminal Court A.D. 1948." Id. at 394, "List of Traverse Jurors That Were Excused From the May Term of Criminal Court A.D. 1948".

30. Upon appearing in court the names on the Traverse Jury List were called and the jurors presence noted thereon (Foster-Zeitz Resp. Ex. No. 1, Darcy Resp. Ex. No. 2). They did not receive attendance cards. At the end of the jurors service the Traverse Jurors List was certified, together with, an individual voucher for each juror (Foster-Zeitz Resp. Ex. No. 3(a) et seq., Darcy Resp. Ex. No. 4(a) et seq.) by the Clerk of Courts to the Controller. The latter paid each juror upon each juror signing an individual receipt therefor (Foster-Zeitz Resp. Ex. No. 1, Darcy Resp. Ex. No. 1). The Traverse Jury List and the individual jurors vouchers show only the number of days not the dates served. In view of the foregoing there was no necessity for reopening the hearing to obtain additional evidence as requested by relator.

31. (1) In the Darcy case: Wm. P. Pardoe, Yardley, Trenton, N. J., foreman; (2) Mrs. Anna Bucher, Newtown, housewife; (3) Marvin D. Weidner, Telford, clerk; (4) Jesse H. Horne, Quakertown, farmer; (5) Oliver C. Landis, Perkasie, farmer; (6) Franklin T. Fretz, Perkasie, salesman; (7) Roger Mason, Perkasie, farmer; (8) Howard Price, Doylestown, farmer; (9) L. Calvin Fluck, Quakertown, hosiery knitter; (10) Mrs. Elva A. Shive, Dublin, housewife; (11) Mrs. Ruth G. Bliss, Doylestown, housewife; (12) Mrs. Ann L. Reed, Penns Park, housewife. Alternates: (1) Wm. F. Hickey, Morrisville, Tel. Constn. Supt.; (2) Mrs. Virginia Brillman, Point Pleasant, housewife.

32. Two extra in selecting alternates. N.T. Foster-Zeitz 527. Before being sworn juror No. 12 was excused for illness; replaced by another. N.T. Foster-Zeitz, 389.

33. Foster-Zeitz: 11:00 A.M. May 24, to 2:55 P.M. May 27, N.T. 4 to 544, 120 summoned; 86 responded (2 non est; 2 deceased, 30 excused by Judge Keller—illness, physical defects, home conditions, etc.). After 66 were examined, 8 selected, May 25, 3:10 P.M. venire 50 N.T. 258. After 121 were examined, 11 selected, May 26, 4:00 P.M. venire 25. N.T. 455, Rel. Ex. Nos. 1, 10, pp. 341, 344. Seven of the 25 were examined. 175 summoned; 143 examined. Neither Darcy or Capone names were mentioned.

34. Darcy: 10:15 A.M. June 7, to 1:55 P.M. June 8, N.T. 2 to 270. 120 summoned; 81 responded (6 non est; 2 deceased; 31 excused), Id. Note 33, supra. Defense counsel objected to the number excused, but see Com. v. Pasco, 1938, 332 Pa. 439, at page 444, 2 A.2d 736. When the Commonwealth requested alternates, Mr. Achey, at sidebar, stated he intended to move for a change of venue if an extra venire was required, the Darcy case being the second case under a single indictment, but see Com. v. Riggs, 1934, 313 Pa. 457, 169 A. 896. The occasion did not arise.

the trial, seventeen for fixed opinions or bias.[35]

Darcy exercised only ten peremptory challenges; the Commonwealth eight. Challenged for cause or excused were twenty-five with conscientious scruples; nine for illness, physical defects, home conditions, etc.; one client; fourteen for fixed opinions or bias.[36] [37] [38]

Once accepted the jurors were kept together, during the trial, under the watchful care and supervision of court officials (in Foster-Zeitz 3, in Darcy 4 uniformed tipstaves). The jurors were

35. Four knew Kelly: No. 9 worked with him, followed the case; No. 41 read the Newtown, Doylestown and Philadelphia papers, and talked about it at work; No. 60 read the papers; No. 74 knew Kelly and some of the witnesses, read local and Philadelphia papers; 6 knew counsel; No. 64 Atty. Freed; No. 84 Atty. Smith, read about and discussed the occurrence; No. 126 Atty. Smith, his wife's counsel, read about it at the time and recently; No. 134 former client of Atty. Rubin, and read the papers; No. 109, District Attorney Biester, read about the occurrence; No. 125, the District Attorney and his assistant, Mr. Curtin, read about and discussed the case. Three read the Philadelphia Evening Bulletin, No. 78, No. 119, No. 128; the latter the Quakertown Free Press. One read the Philadelphia and the local papers, No. 110. Two read "the papers", (No. 82) and discussed it (No. 141). One read the Doylestown Daily Intelligencer at the time (No. 69). But quaere No. 69, No. 82, No. 119, No. 134.

36. No. 43 knew Kelly's brother, visited the Feasterville Tavern, read the papers, but said his opinion might be changed; No. 69 lived near the Feasterville Tavern, knew the owner, proprietor, and some of the witnesses in the case; No. 35 knew the Beacon Inn proprietor, read about and discussed the case; No. 29, Juror Westlake (see Note 37 infra) read or heard about the case; No. 62, Juror Slaughter read about the case, attended some session of the Foster-Zeitz trial "off and on"; no opinion; No. 5's wife worked in Mr. Biester's law office, read the papers and discussed the case; No. 65 read about the case; No. 67 read some, "mind set"; No. 75 read papers and discussed case; No. 19 read about the trial in the Doylestown Daily Intelligencer; no opinion in the Darcy case, scruples; No. 25 read "more or less"; "I think I have an opinion", "some scruples"; No. 39 faulty hearing, read about case; No. 45 discussed case; No. 54 read about and discussed case; drove truck for Philadelphia Inquirer; No. 5, No. 19, No. 45 were challenged by the Commonwealth; No. 39, No. 62 were ex-

cused by agreement. Quaere as to No. 19, No. 25, No. 39, No. 54, No. 62.

37. After three jurors were selected, not sworn, Mr. Achey questioned Juror Westlake as follows: "Q. Have you formed any opinion as to the guilt or innocence of this defendant, David Darcy? A. Well, I think—yes, I have. It is one of the most cold-blooded murders I have heard of." Mr. Achey: "If your honor please, I ask—" The Court: "That will be stricken out." Mr. Achey: "I object to that answer. It was uncalled for." The Court: "Objection sustained. Do not venture any opinion. Just answer the questions in the way they are asked of you." Mr. Achey: "I would also ask for a mistrial by reason of that statement." Court: "Motion denied." Mr. Achey: "Exception." Court: "Yes, the jurors already selected will totally disregard that remark or answer made by that juror." Mr. Achey: "May I ask that this juror be dismissed." Court: "He will be discharged for cause." N.T.–T. 97, see Rel. Ex. No. 82, and see Com. v. Dreamer, 1936, 324 Pa. 220, at pages 222–223, 188 A. 117. Next morning at sidebar, the District Attorney moved that the 8 then selected be excused to avoid any other such incident. Upon Mr. Achey's objection the motion was not pressed. N.T. 189–190, and see voir dire, Juror No. 34, Mrs. Rosenberger, and Juror No. 37, Harold Lake.

38. See and cf. Rel. Ex. No. 59, May 26, "conscripted"; Rel. Ex. No. 61, Id. May 27, " * * * searching for jurors * * * willing to serve if accepted." Rel. Ex. No. 74, Id. June 3, "The Gossiper", " * * * flurry of dodging", citing reasons. Id. loss of wages, business engagements, dislike serving on murder jury. Id. "never sat that long".
Rel. Ex. Nos. 80, 81, June 7, " * * * long ordeal * * * drawing * * * jury * * * great difficulty * * *" Rel. Ex. No. 82, June 8, "Less trouble than * * * Zeitz and Foster * * *" Rel. Ex. No. 111, June 10, "While many * * * thought * * * jury * * * difficult to secure * * * took less time than * * * last week."

not permitted to see any newspapers, hear any radio, or see any television program. They were kept free from any outside influence or contact.

At no time during the trial was there any need to call for order.[39] There were

no outbursts, no disturbances, no untoward incidents either in or outside the court room, in Doylestown, or elsewhere throughout the county.[40] None from December 22, 1947, down to or after the trial. At no time during either trial

39. But see Rel. Ex. No. 76, June 4, "The grief stricken mother of * * * Zeitz, collapsed in court Thursday afternoon just before her son's attorney * * * started his address to the jury. She was rushed to the * * * hospital after (a) doctor * * * was called to the court room.

A few minutes later, Mrs. Ethel Foster * * * also received medical attention from court attendants. When she became ill * * * Zeitz jumped to his feet and tried to get to his mother's side, but was held back by State Troopers.

Judge Boyer directed that the defendants be removed from the court room until the dramatics were over." Incidents not reported in N.T. 1298, 1299. Rel. Ex. No. 88, June 10, Darcy's mother collapsed in the corridor; court officers summoned a physician. Id. Judge Keller commented on the actions of a number of young girls defacing the newly painted walls of the ladies room while attending court. Rel. Ex. No. 136, "Front Page Detective", Vol. 12, No. 2, June 1948, Copyright 1948 (Dell Pub. Co. Inc.) 73 pages, 15¢—contained as the 12th of 14 stories, "'Kill Crazy! * * * Could they be stopped short of murder?" by John Keith. Across pages 34 and 35 a picture posed by models carried a legend substantially factual as to Hellerman's plight December 22; pp. 34, 36, 37 interspersed with pictures (p. 36 Feasterville Inn, police, p. 37 police with three of the defendants—not Capone—at their preliminary hearing) first tells of the Bell's Corner Tavern incident, of the efforts of the police to capture defendants before anyone was killed; parts of pp. 70, 71 and 72 relate incidents on December 22; finally, "The case against them is being prepared, and the men will be brought to trial following indictment by the Bucks County Grand Jury." The defendant's brother and sister each testified that on occasion there were some copies of the magazine in the court room, once while the trial was in progress, 3 copies; another during the noon recess, 15 copies. If there were any such magazines in the court room they were concealed from the eyes of the court room attendants and did not under any circumstances come to the

attention of the District Attorney, his assistant, the court, or the jury. See N.T. 539-546, 550-557, 571-573, 582, 586. And see Resp. Ex. No. 5, pars. 17, 18, no extra police precautions.

40. Relator called seven witnesses who heard remarks between December 22 and June 15, to prove the feeling of people in general toward the defendants, contending that this evidence and other circumstances amounted to a state of hysteria and prejudice and that the feeling grew in intensity, reaching its climax at the Darcy trial. The evidence supports no such contention. (a) Rev. A. Damroach, St. Paul's Episcopal Church, Doylestown, acquainted with Harold Zeitz; remarks principally by members of his parish. (b) Rev. Wm. Babinsky, Reformed Church of America, Feasterville ("roughly fifteen miles from Doylestown"; pop. about 1500; church membership "roughly 150"; regular attendance "difficult * * * to remember * * * perhaps 100"; knew Kelly and officiated at his burial service), as to conversation in the Feasterville area. (c) Cole Farrier—attorney for Harold Zeitz (not of record during the trial—Attorney Rubin engaged for that purpose) prepared and argued appeal before the Supreme Court of Pennsylvania and application before the Pennsylvania Board of Pardons; counsel for some patrons robbed in the Feasterville Inn; member of the Society of Friends and opposed to capital punishment—as to the Feasterville area and commuters on the morning Philadelphia train. (d) Dr. Carl J. Hoffman—examined Darcy in 1950 and wrote a letter on his behalf to the Governor of Pennsylvania —as to remarks in Feasterville, Newtown and Richboro. (e) Howard R. Price, a friend of Darcy's sister, who resided in Andalusia in the S.E. tip of Bucks County but as a salesman of automobile parts made monthly calls in Bristol, Doylestown and Sellersville. (f) Leicester Knickerbacker Davis*—a pho-

* Philadelphia Public Ledger, discontinued about 1935; connected with Society Prevention of Cruelty to Animals; July 1944, security clearance by Fourth Naval District to visit naval establishments, Rel.

Ex. 131; March 1945, Lieutenant temporary Coast Guard, public relations liaison officer, 4th Naval Dist., to serve without pay, Rel. Ex. 130; claimed to be a "war correspondent" but quaere, he was never outside continental United States. Apparently on occasion visited United States Army camps, see Rel. Ex. 127; Collier's April 1945, a two page picture story about the training of G.I. War Dogs, Rel. Ex. 128; Collier's September 1941, witness given credit for four pictures interspersed in a two-page story written in a light humorous vein by one G. W. about army camps, Rel. Ex. 125; November 1940, two page picture story, "People and Places" on police cars in Philadelphia, no byline, Rel. Ex. 129; Commonwealth Magazine, four page picture story of Bucks County; civil defense work, Bucks County and Borough of New Hope during a four month period, Rel. Ex. Nos. 132, 133, 134. tographer who came to Doylestown December 13, 1947, after an absence of 22 years—approached and questioned perhaps 100 to 150 people in the Doylestown area to ascertain their reaction to the crime to provide background material to write an "early American naval novel * * * probably evolving into a book on the responsibility of society as regards youthful crime." (N.T.–H. 417). (g) Mrs. A. Patterson, Zeitz' aunt and (h) Mrs. Inez Darcy Heckman, Darcy's sister, as to remarks in Doylestown. Generally the witnesses could not recall any particular person or the time or place of any particular remark, or exactly what they heard in context.

The several witnesses testified: (a) The feeling then and now was one of " * * * indignation * * * antagonism towards the defendants and a general feeling that they all were guilty." (b) talked with 100 people during that time; "the prevailing sentiment of the community * * * bias in favor of condemning the defendants * * * some said they don't need a trial * * * they should be condemned to death * * * shouldn't have any mercy * * *" "There were no expressions of threats of violence in the sense that anybody was going to organize against the defendants * * * people said they ought to be hanged * * * shot * * * get the chair * * * one said they ought to be stamped out like bugs." There were at no time any disturbances or other unusual incidents. (c) talked to about 50 people; saw about two copies of the local newspapers; heard some radio comments; one of the patrons of the Feasterville Inn thought Zeitz ought to burn because he fired the shot.

Some people were displeased because he was representing Zeitz and let him know it; others asked when the defendants were going to burn; some facetious—some serious; notwithstanding this, the witness raised no such question on the Zeitz appeal. (d) "They ought to be hanged * * * get the chair * * * why bother with them * * *" The idea of " * * * gangsters * * * coming into Bucks County doing these crimes * * * should have stayed in Philadelphia * * * should be no mercy * * * we should throw them out." (e) " * * * they had no place there * * * they should be given Bucks County justice." Once in the spring in a store in Sellersville and again at a gas station in Andalusia he heard " * * * if they had anything to do with it they would see that the boys were lynched * * *" At other times he heard the word "hang", "shot". We rejected Ex. No. 117 offered to refute any idea of fabrication of the witness' testimony because the words used in court were not contained therein—the letter contained a series of conclusions; Mrs. Price was not in court and we had grave doubts that the witness was the author of that letter. (f) "People were shocked", "We * * * are not a lynching community * * * a large percentage (50 – 60 – 70) of the people I talked with were outraged and they thought there should be very drastic punishment meted out * * *" "Criminals cannot come into Bucks County and commit crimes * * *" Some " * * * hope they would get the hot seat * * * some wild talk * * * like to see them taken out and shot * * * strung up * * *" (g) Heard a maid say, " * * * just like a carnival", "they haven't got a chance * * * because they hate Philadelphia boys and they are very, very bitter * * * they're going to burn for it." A man said "all cut and dried * * * before it starts." Outside the court house some men said they were going to see the execution. Quaere, an emotional witness whose testimony we did not believe either in this or other particulars (e.g., as to an alleged remark by the District Attorney, one by Judge Boyer and another by school children). (h) In January and in the spring heard some man say at lunch in the Doylestown Inn "they shouldn't go to all that bother * * * they don't deserve a trial * * * they should be strung up." In one of the court house offices during lunch time, during the Darcy trial, heard someone say, " * * * He doesn't stand

was the court room filled to capacity.[41] The attendance at the Foster-Zeitz was larger than at the Darcy trial.[42] The proceedings were reported in the daily press [43] and, on occasion, on the radio.[44]

a chance either"; " * * * He's going to get it too".

N.B. (a) Attended one session of the Foster-Zeitz, not the Darcy trial; (b) One day at the Foster-Zeitz, not the Darcy trial; (g) Second week of the Foster-Zeitz, not the Darcy trial; (h) Darcy trial, not Foster-Zeitz; (f) Not remember the Darcy trial as well as the Foster-Zeitz; (c) (d) (e) Not at either trial.

41. See Certificate Keller P. J., "16. The trial was held in the main court room with seating capacity of approximately five hundred persons. The attendance at the Darcy trial was surprisingly small, in number, and at no time throughout the trial was the court room more than partially filled." The attendance was never more than 300; rarely over 200; during the voir dire examination only 50 to 60 persons.

42. Foster-Zeitz: Rel. Ex. No. 58, May 25, Judge explained voir dire procedure to 200 high school students attending trial; Rel. Ex. No. 70, June 2, night session attended by several hundred spectators; Rel. Ex. No. 74, June 4, "So great is the interest * * * that an extremely large number of spectators crowded into the court room yesterday". Rel. Ex. No. 78, June 5, "more than three-quarters filled" when verdict rendered.

Darcy: Rel. Ex. No. 88, June 10, evidence "much the same"; Rel. Ex. No. 111, June 10, Newtown Enterprise, Id.; Rel. Ex. No. 91, June 11, Id. 1 Rel. Ex. No. 95, June 12, by agreement of counsel, only the statements implicating Darcy were introduced; Rel. Ex. No. 88, June 10, girls present; Rel. Ex. No. 92, June 11, " * * * at least 200 spectators" this morning "many of them young folks". Rel. Ex. No. 97, June 12, considerably more young girls than boys—some youngsters not five years old.

43. Foster-Zeitz trial: Doylestown Daily Intelligencer, daily ex. Sun. for 125 years [Doylestown Borough, County seat, laid out 1778, pop. 1950—5262, 1940-4976 (Twp. 2364—1471)] Cir. Oct. 7, 1947—5297; Oct. 6, 1948—5329; N.T.–H. 226-227, 231, primarily in center of county—Doylestown, Newtown and parts of Montgomery Valley, N.T. 194, Rel. Ex. No. 55, May 24 to No. 78 June 5. Bristol Daily Courier, daily ex. Sun. [Bristol Borough, pop. 12,710—11,895 (Twp. 12,184—5,857)] common ownership with Doylestown Daily Intelligencer; file copies being microfilmed, not produced; same coverage with more moderate makeup, space allocation, headlines and editorial policy. N.T.–H. 368-369, 370-373. Cir. Sept. 30, 1948—5397, N.T.–H. 370-372, eastern and lower Bucks County—Morrisville, Penndel, Bristol Twp., Benalsem Twp., mostly in Bristol Borough and surroundings. N.T.–H. 372. Newtown Enterprise, weekly Thur. [Newtown Borough, pop. 2095—2009 (Twp. 1013-816)] Cir. Oct. 7, 1948—1972, within five mile radius, N.T.–H. 255-259, Rel. Ex. Nos. 109, 110, June 3; Rel. Ex. No. 111, June 10. Quakertown Free Press, weekly Thur. [Quakertown Borough, pop. 5673—5150)] Cir. not quite 5000, nothern part of county, radius 25 miles, Rel. Ex. No. 123B May 27, 123E, June 10.

Darcy trial: (a) Doylestown Daily Intelligencer, Rel. Ex. No. 80, June 7 to Rel. Ex. No. 102, June 15, Rel. Ex. Nos. 103, 104, 105, June 17, Rel. Ex. No. 106, June 19; Quakertown Free Press, Rel. Ex. Nos. 123F and 123G, June 17; and see Newtown Enterprise, Rel. Ex. No. 111, June 10.

Pre-trial, Foster-Zeitz and Darcy: Doylestown Daily Intelligencer, December, 6 issues, Rel. Ex. Nos. 12 to 22 incl.; January, 4 Issues, Rel. Ex. Nos. 23 to 29 incl.; February, 6 issues, Rel. Ex. Nos. 30 to 41, incl.; March 1 and 3 (2 issues) Rel. Ex. Nos. 43 to 45 incl.; April 2, 3, 17 (3 issues), Rel. Ex. Nos. 46 to 48 incl.; May 7, 12, 14, 19 (4 issues) Rel. Ex. Nos. 49 to 54 incl.; Newtown Enterprises, Rel. Ex. Nos. 107, 108, Jan. 1, 1948.

Foster-Zeitz trial: Doylestown Daily Intelligencer, May 24, 25, 26, 27, 28, 29 (6 issues) Rel. Ex. Nos. 55 to 66 incl.; June 1, 2, 3, 4, 5 (5 issues) Rel. Ex. Nos. 67 to 79 incl.

Darcy trial: Id. June 7, 8, 9, 10, 11, 12, 14 (7 issues) Rel. Ex. Nos. 80 to 100 incl.; June 15, 17, 19 (3 issues) Rel. Ex. Nos. 101 to 106 incl.

The Doylestown Daily Intelligencer is published at 1:30 P. M. daily. N.T. 229. By noon June 8, 12 jurors had been selected; 2 alternates by 2:00 P. M.

(Population figures—Penna. Manual, Vol. 91, 1953-1954).

44. Radio Station WBUS, Doylestown; WBUX, Quakertown; each on the air for the first time May 20, 1948. Extent of coverage WBUS doubtful, N.T.–H. 272-273. Only evidence of WBUX coverage, see Quakertown Free Press, May

The reporting was factual, with an occasional descriptive word or phrase, and, on occasion, words of compassion or commendation.[45]

We found only one instance of editorializing in the news columns. The editorials were stimulating, thought-provoking, instructive and fair comment.[46]

20, No. 123A, May 27, No. 123B, June 10, No. 123E. WFIL Radio and Television, Philadelphia, only evidence of coverage December 23, 1947, 15 to 22 seconds; January 21, 1948, 1½ to 2 minutes; radius of 50 miles; number of TV sets at that time limited. N.T.-H. 267-272. See films, Rel. Ex. Nos. 112-113, and see Rel. Ex. No. 114, Philadelphia Inquirer, Jan. 21, 1948, Philadelphia Inquirer award to Arthur Coffin for frustrating attempted robbery at Bell's Corner Tavern, and to the two police officers for apprehending defendants.

Of 224 jurors examined on voir dire only one of the Foster-Zeitz, No. 142, only two of the Darcy panel, No. 7 and No. 41, heard pertinent radio comments.

45. Rel. Ex. No. 65, "horror", "alleged trigger man"; Rel. Ex. No. 65, "trigger happy bandit", "wise-cracking", "hard boiled behavior"; Rel. Ex. No. 72, "sensational 30 day crime spree"; Rel. Ex. No. 109, "the sordid tale of thrill seeking youths * * *" which "* * * ended in murder", "wantonly".

Words of commendation: Rel. Ex. No. 36, February 10, "* * * impressed court officers and spectators as high school juniors * * *" Rel. Ex. No. 55, "Zeitz * * * wearing his military discharge button * * *" Rel. Ex. No. 72, June 3, Foster entitled to wear 14 naval battle stars; Zeitz served in the Army. Rel. Ex. No. 86, June 9, Darcy's father recently promoted to be assistant crier in Philadelphia courts.

Compassion: Rel. Ex. No. 23, January 5, "Zeitz * * * confessed to firing the shot that killed Kelly (although not intentionally) * * *" Rel. Ex. No. 57, May 25, many opposed to death penalty; Rel. Ex. No. 62, May 27, "two war veterans * * *"; other jurors with conscientious scruples. Rel. Ex. No. 71, June 2, and see Rel. Ex. No. 86, June 9, Capone cannot read or write, cf. Rel. Ex. No. 39, February 11. Rel. Ex. No. 75, June 4, Zeitz' parents and Foster's mother were not in court during charge. Rel. Ex. Nos. 78, 79, June 5, two young killers spend most of their time reading the Bible, cf. Rel. Ex. No. 87, June 9. But see Rel. Ex. No. 123E, "Zeitz * * * glanced almost defiantly at Judge * * * Boyer as he congratulated the jury * * *" State police thought Zeitz and Foster expected the worst from the start. Rel. Ex. Nos. 101,

102, June 15, "Darcy took it like a stoic * * * according to police * * * sensed the verdict several days ago"; Rel. Ex. No. 102, "I expected it". And see Rel. Ex. Nos. 123F and 123G, June 17.

46. To correctly appraise the editorial comments they must be viewed in their proper context. In the fall of 1947 two Philadelphia juries, predominantly women, found a 23 year old defendant, named Hallowell, guilty of murder in the first degree for the killing of two policemen in a gun battle but fixed the penalty at life imprisonment. There were protests of "maudlin sympathy". A proposal by Judge Harry S. McDevitt that the duty to fix the penalty in first degree murder cases should be taken from the jury, contending that they "do not know how to exercise it", was referred to a legislative committee.

December 26, Rel. Ex. Nos. 16 and 17, reported "Bucks County now has a four-way murder case on its hands * * *" In an otherwise factual report written by an able conscientious reporter of 35 years experience, who covered the occurrence and the trials, an editorial comment read "Feeling Runs High, The general feeling of the public—in Bucks County at least—appears to be that no time should be spared in bringing the youthful bandits to trial, that it is a 'break' for society at large to have the trials in Bucks County rather than in Philadelphia."

December 27, Rel. Ex. No. 20, in "Fast Police Work", the editor after thanking the Bucks County and Philadelphia police for their speedy apprehension of the defendants declared, "What the public and police will be watching closely is what is done to these potential killers when they come before the bar of Justice." Recalling one of Darcy's remarks during the Deacon Inn robbery, the editor wondered why policemen take so many chances with dangerous criminals, especially in view of the recent Philadelphia verdict. December 31, Rel. Ex. No. 22, "Errors of Jurors", discussed acquittals when there was ample evidence, the feasibility of having professional Jurors; that Judges sometimes do not rise to their responsibilities; such problems arise in cases of murder, drunken drivers, and in coroner's juries in highway death cases. The editor declared

" * * * responsibility for miscarriage of justice does not rest alone with jurors * * * but in the courts and in the public's mind as it is expressed in antagonism to punishment for certain types of offenders." February 2, Rel. Ex. No. 31, "Who'll Be the Next?" discussed the problem of assaults by holdup men on the aged, on streets and in shops. Authorities and the public should insist that they receive impressive punishment to deter others from following their example. The editor declared, "If juries and courts will make examples of these cowardly enemies of society, there will be fewer of these assaults. It would be lamentable if citizens were forced to take the punishment * * * into their own hands." An INS news story February 6, Rel. Ex. No. 34, reported that the legislative committee chose to preserve the power of jurors, believing that a legislative proposal for separate findings by juries would result in more satisfactory verdicts. Id. No. 34 described the February Term of Court as one of the most important criminal sessions in a long time.

A Calstadt, N. J., truck driver was fined $25 for attacking a married woman; some citizens, displeased with such a disposition, tarred and feathered the defendant. February 11, under the title "Enraged Citizens", the editor declared that "Mob law is not the kind we want in this country * * * but * * * probably * * * thousands of women * * * felt like cheering when they read * * *" of the public reaction in New Jersey. "Presumably they felt that $25 * * * inadequate to intimidate others * * * and remembered that courts have even let rapists escape with ridiculously light punishment * * * not * * * so gentle * * * if own families * * * the victim * * * in Delaware * * * if * * * convicted * * * face the death sentence." February 16, Rel. Ex. Nos. 40, 41, reported the arrest by Doylestown police of six young Philadelphians said to have committed six Philadelphia robberies, a $3,000 robbery in Bucks County, stolen motor vehicles, violated the fire arms act, and attempted to rob a large Bucks County estate. When arrested they were carrying stolen revolvers and 114 rounds of ammunition. Some of them were acquaintances of Foster, Zeitz, Darcy and Capone. On the front page a box read, "Ten Young Problems"—"Something to worry about in the way of juvenile delinquency has been furnished by ten Philadelphia boys now incarcerated in the Bucks County prison. Four of the boys

are charged with murder. Six of the boys are being charged today with robbery, fire arms violations, stick-ups and burglary. Ages of the boys make police and others wonder what's going to happen next? Two * * * are juveniles, age 16 * * * another * * * 17 * * * two * * * are 18; one is 20; one * * * 21; two are 22; * * * one 23. One of the sixteen year old boys carried a loaded revolver in his stocking, and one 18 year old boy was the one accused of pulling the trigger in the murder case."

February 18, Rel. Ex. No. 42, in "Time for An Example", the editor commented: "The Overflow of Philadelphia's young criminals into Bucks County, might, it seems reasonable to believe, be discouraged if the crooks were given sentences which would be impressive and get headlines large enough to be seen and become impressive. Stiff sentences have had that effect before. Once before it brought an epidemic of arson to an end for several years. Another time it taught tramps, who had been filling the county jail and bedeviling the people of lower Bucks, to keep away from the county. Recent arrests of two gangs of young criminals, one of them held for murder, should help to discourage these criminal forays into the county * * * *especially if they are convicted and sent away for impressive periods.* Trying to find excuses for enemies of society invites more crimes." (Italics supplied).

A 17 year old student arrested by the Philadelphia police was reported to have admitted setting fire to nine buildings, some of them schools; he said he did it "just for fun". The editor commented, "Unless the courts recognize the awful possibilities of such an attitude * * * and take away their opportunities for destroying property and lives, the public will continue to be menaced. Institutional restraint for persons with such impulses is the only protection for society and *the protection of the public should be the first consideration.*" (Italics supplied).

In Philadelphia an intoxicated driver in a stolen car, while racing another automobile, lost control, crashed over a sidewalk into a group of women and killed a woman pedestrian. After finding him guilty of murder in the second degree the judge sentenced him to 2½ to 5 years. The Philadelphia Inquirer declared in an editorial, "Mild Sentence for Murder", reported in Rel. Ex. No. 46 on April 2. "Mild Sentence for Murder" said inter alia, "As a deterent to criminally reckless automobile drivers, the

sentence * * * is grossly inadequate * * * Murder, whether with a gun or an automobile calls for penalties that will properly punish the offender and stand as a clear warning to others. This sentence does neither * * * the safety of the careful * * * rather than any hardships suffered by the guilty drivers * * * should be the paramount consideration. The *criminal negligence* responsible for the continuing slaughter on the highways *will not be cured until all culpable parties know their punishment will be sure, swift and severe.* Light penalties will delay the achievement of real highway safety." (Italics supplied).

April 18, Rel. Ex. No. 48, under the title "If 'Sob Sisters' Lay Off", the editor declared, " * * * three of the holdup men * * * captured here, with an arsenal in their car, and sentenced in Philadelphia this week for crimes there * * * will be out of circulation and mischief for a term of years long enough to give them time to realize that crime doesn't pay * * * and * * * serve as a lesson to others. They were sentenced to from ten to thirty years in the Eastern Penitentiary by Judge * * * McDevitt * * * who commented that they would probably 'wind up in the electric chair'. The Judge made it clear that he has little hope that characters of their ilk will not (sic) learn the needed lesson * * * and must be restrained from further victimizing the public. 'You wise guys start out with guns and usually wind up in the electric chair', * * * Unfortunately, despite adequate proof that the statement was not an exaggeration in many instances, there still are Judges and Pardon Boards not yet convinced that thugs of that type should not be given an early opportunity to prey on the public. It seems to be the time to stop making guinea pigs of the law-abiding members of society."

May 7, Rel. Ex. No. 49, under the title "Jurors Rebuked Again", the editor pointed out that another jury in Philadelphia acquitted a man caught with his arm through a broken window and in possession of a set of burglar tools. It was not clear whether or not his past record was offered in evidence. Speaking again of the Hallowell case the editor suggested the possibility of having professional jurors.

May 25, Rel. Ex. No. 57, under the title "Mercy is Overdone", a news story quoted Mr. Justice Jackson's criticism of the majority decision in the Homer Price case, Price v. Johnston, 334 U.S. 266, at page 295, 68 S.Ct. 1049, 92 L.Ed. 1356.

June 5, Rel. Ex. No. 78, another news item, "Three Philadelphia Youths lived near Zeitz and Foster * * *" One of those arrested was one Robert White, 18, charged with breaking and entering and stealing a radio.

*After the Darcy jury was selected and sworn:* June 8, Rel. Ex. No. 84 included a reprint of an editorial from the Philadelphia evening Bulletin: "Cries of 'maudlin sympathy' * * * last Fall * * * women * * * on jury * * * blamed. * * * No such cries are being heard as the result of two murder verdicts. * * * In Doylestown two youths were sentenced by a jury to be executed for murdering a man after a holdup in Feasterville. In Philadelphia another jury, which had nine women among its members, voted a similar penalty in convicting the slayer of a policeman. Four women were on the jury in Doylestown. These verdicts are a vindication of women as jurors, and afford convincing evidence that opinion on use of the death penalty is not determined solely by sex. *Members of these juries deserved the commendation they received from the trial judges.*" (Italics supplied.)

June 10, Rel. Ex. No. 90, on the same subject the editor of the Doylestown Daily Intelligencer under the title "Verdicts Highly Praised" stated "Newspapers and individual citizens have in the past week highly praised the jurors who returned a verdict calling for capital punishment for three convicted killers. And on those juries were women in each instance. The Almeida verdict in Philadelphia and the conviction of Zeitz and Foster for murder in this county have been universally lauded. This endorsement of the extreme punishment for callous killers indicates very definitely that the public has become disgusted with the pampering of vicious criminals, although that was clear earlier. Earlier the jury which convicted a Philadelphia murderer in the first degree * * * but only designated life imprisonment * * * was subjected to a storm of denunciation by a great many persons. Imposition of capital punishment may not end all murders, but it does intimidate a great many potential killers."

Finally on June 12 Judge Boyer sentenced Robert White in another court room than that in which Darcy was being tried, out of the hearing and without the knowledge of the Darcy jury.

June 17, Rel. Ex. No. 105, "Raus Mit 'Em"*; "Judge Calvin S. Boyer's warn-

* Out with them—see and cf. A Dictionary of the Non English Words of The Pennsylvania German Dialect by Marcus Bachman Lambert (1924) Lancaster Press, Lancaster, Pa.

The newspaper policy was one of giving the public the news, the facts to which they were entitled, having in mind the regular as well as the occasional reader.[47] Overall there was a sincere effort to put out a good newspaper, following time honored traditions, in the exercise of a constitutional freedom—the Freedom of the Press.

In neither case was there any testimony offered on defendant's side of the case.[48] Foster and Zeitz, although afforded an opportunity by the court, the

ing to tough crooks from Philadelphia and other places to keep out of Bucks County or take the consequences * * * should be impressive * * * because recent juries of men and women convicted three trigger happy young holdup men involved in the killing of a respected resident of Feasterville, without provocation, and recommended their execution in the electric chair. The warning has been given before, but not under such impressive circumstances. At any rate the jurors in the Feasterville slaying case probably indicated the reaction of people in this county to the vicious lawlessness of a great many young crooks who have operated in the county. Convictions of even murderers in the first degree with the death sentence have not been numerous in recent years * * * which should convince potential bandits and killers that leniency on the part of jurors is not likely to be easy to get. For a long time jurors or the court have made it clear that they wanted to give the young offenders every chance to show that they would reform * * * but the evidence appears to unmistakably indicate that Bucks countians have concluded that leniency has merely been taken as an indication of weakness. The conviction of the three young men for a wanton and unprovoked murder * * * the imposition of the death sentence * * * together with Judge Boyer's warning * * * it is to be hoped will cause bandits and killers to stear clear of the county. Getting tough has worked that way in other instances."

47. "The Gossiper", Jan. 16, Rel. Ex. No. 25, contra police chiefs, suggested solution of juvenile delinquency, i.e., to exclude mystery and thriller stories from the radio. Danger of censorship spreading to books, plays, and the press; suggests gangs, adventure, easy money, sex crimes, mental problems, lax law enforcement, soft treatment, failure to place in institutions, as causes. Advantages of freedom of the press. "If * * * subnormal were given institutional care * * * and the courts and jurors were to dispense with a lot of sentimentality about criminals * * * the general public would not face so many horrible crimes as horrify newspaper readers daily." Jan. 16, Rel. Ex. No. 26, defendants given supervised recreation. Jan. 21, Rel. Ex. No. 27, "Crime is a One Way Street, the Street of Regret", suggests that this warning should be read by every juvenile and many adults. Gangsters may come even from fine parents and fine homes, citing as an example Dutch Schultz whose teacher predicted he would have a bad end.

April 3, Rel. Ex. No. 47, futility of attempts to avert publicity when charged with drunken driving. Jail and publicity deter crime. May 28, Rel. Ex. No. 63, bus ride for jury. June 10, Rel. Ex. No. 80, stressing the beauties of the rural area. June 5, Rel. Ex. No. 79, as to the numbers making homes in Bucks County and commuting to Philadelphia. June 12, Rel. Ex. No. 97, defendant's escapades understandable in light of present day movies and radio.

June 14, Rel. Ex. No. 100, Darcy's reaction to sentence compared to that of others in the past. June 18, Rel. Ex. No. 106, suggests that even nailing things down may not stop thieves, citing examples.

May 26, Rel. Ex. Nos. 59, 60, questions on voir dire indicate that the Commonwealth may ask for the death penalty. Rel. Ex. Nos. 63, 64, May 28, in opening the District Attorney left no doubt he will ask for the death penalty in his next speech to the jury. Rel. Ex. No. 70, June 2, "Slowly but carefully the Commonwealth is leading up to the point when it will ask that the jury demand that Zeitz and Foster pay with their lives * * *" Rel. Ex. No. 85, June 9, in opening the District Attorney did not mention the death penalty. He asked for it in the summation of the Foster-Zeitz trial. In re High School Commencement, see Rel. Ex. No. 79, Saturday, June 5, Rel. Ex. No. 88, June 10, time and place of exercises; rescheduling not mentioned, cf. Rel. Ex. No. 93, June 11. There was evidence offered as to when the change, if any, was made.

48. N.T. Foster–Zeitz 1295–1297, Rel. Ex. No. 72, June 3, N.T.–T. 860, Rel. Ex. No. 94, June 12.

jury being absent, declined to testify. Darcy did not testify.

The strategy of respective trial counsel for the defense, other than Zeitz, was to show that their client did not fire the fatal shot and, as to all the defendants, to work toward and hope for keeping the punishment down to life imprisonment instead of the death penalty.[49]

After the closing pleas of counsel [50] and the charge of the court on the law and the evidence,[51] a verdict of guilty of murder in the first degree fixing the

49. Rel. Ex. Nos. 75, 76, Attorney Rubin, " * * * true * * * a Jesse James couple. The Commonwealth want to send these boys to their death. Zeitz, I am certain, is a victim of an unsettled age. I would certainly urge you that life imprisonment and not the death penalty would be proper in this case * * * They are not desperados; they are 'trigger happy kids', the victims of extreme juvenile delinquency and the times". The District Attorney replied, "Yes, they are a sorry lot today, but they were as brazen as they could be during this trial and during their escapades of crime. There is nothing, in the opinion of the Commonwealth, that would justify anything less than the supreme penalty, which the Commonwealth is asking."

June 14, Rel. Ex. Nos. 98, 99, the District Attorney argued that the defendants' conduct was atrocious and vicious, that they morally murdered three men, Kelly dead, the other two disabled, one for life. "The Commonwealth * * * thinks you will have * * * no trouble in finding the defendant guilty of murder in the first degree. I challenge the defendant to put any mitigating circumstances in this case and we argue that the supreme penalty should be paid." Mr. Achey: Darcy killed no one, therefore he should not pay with the death penalty. "I do not think Darcy is guilty of a cruel and deliberate murder * * * There is no doubt that a man was killed, and that it was during the perpetration of a robbery, and for that reason the crime of first degree murder has been established, but we ask you to fix the penalty at life imprisonment."

50. N.T. Foster-Zeitz 1297, the District Attorney first; limited in rebuttal. N.T.-T. 862. On defense counsel's objection, the District Attorney closed first and was allowed no rebuttal.

51. Judge Boyer waited until Friday to charge so the jury would have a full day ahead to deliberate; advised that only two defendants were involved; stressed the care with which the jury was selected; explained that they were kept together to assure a fair and impartial trial; that they were the judges of the facts; consider each defendant separately as to guilt and penalty; may consider evidence of Deacon Inn robbery to determine whether defendants committed robbery at Feasterville Inn; if their verdict was guilty of murder in the first degree, with evidence of other offenses in determining punishment or penalty; draw no unfavorable inferences from defendants' failure to testify; presumption of innocence; burden of proving guilt beyond a reasonable doubt. Toward the end of the charge Judge Boyer said, "If you find that it was a murder committed in the perpetration of a robbery, then your verdict should be murder in the first degree." "The punishment or penalty * * * (is) * * * left largely to the sound discretion of the jury." (p. 1330) " * * * youth alone does not excuse them from responsibility for their acts * * * (or) * * * from just punishment therefor * * * " (p. 1334). If during the charge the court expressed any opinion on the facts or the conclusions to be drawn therefrom, they were not bound by the court's opinion. "Those matters are for you to form opinions on * * * In the opinion of the court if you find these defendants, or either of them, guilty of murder in the first degree then the death penalty would be the just and proper punishment for the crime. However, we again remind you that the question is entirely for you and you are not bound by the opinion of the court."

Exception was taken to the court's expression of opinion as to penalty.

After argument but before decision on defendants' motions for a new trial, illness overtook Judge Boyer, incapacitating him from further service, resulting ultimately in his resignation and death. Upon reargument before Judge Keller and Judge Fred W. Davis, 43rd Pennsylvania Judicial District, specially assigned, the motions were denied. Judgments of conviction and sentence were affirmed. Com. v. Foster, March 20, 1950, 364 Pa. 288, 72 A.2d 279; Com. v. Zietz, March 20, 1950, 364 Pa. 294, 72 A.2d 282. Each opinion held that Judge Boyer did not exceed the bounds of propriety so long as the question was left to the decision of the jury. Mr. Justice Jones dissented:

penalty at death was returned by the jury in each case.

After the verdict was recorded at 1:45 P.M. June 4, Judge Boyer was reported (Rel. Ex. No. 78, June 5) as having said to the jury: "I don't see how you could, under the evidence, have reached any other verdict. Your verdict may

(a) evidence of other crimes unrelated to questions at issue and were improperly admitted, but see Com. v. Darcy, 362 Pa. at page 259, 66 A.2d 663; Com. v. Depofi, 362 Pa. 229, 66 A.2d 649; (b) a trial judge should not express any opinion as to the penalty, a question solely for the jury.

Judge Keller commended the patient, careful, undivided attention given by the jury throughout the trial; pointed to the careful, searching examination to obtain jurors who would weigh, consider and pass upon the evidence in a fair, impartial, and dispassionate manner, uninfluenced by sympathy, prejudice, passion or emotion, or by anything other than the law and the evidence; instructed the jury that they were the sole judges of questions of fact; that the facts should be determined only from evidence submitted at the trial not from anything they may have read or heard from any other source; the defendant had a right under the law to be tried separately; they should draw no unfavorable inferences from defendant's failure to testify or offer evidence in his behalf. The court did not review the testimony in detail, stating that it had already been covered by the District Attorney and Mr. Achey, "both able and learned men". The purpose of the testimony as to all other crimes was limited to their possible use in fixing the penalty. After defining murder at common law and under the Act of March 31, 1860, P.L. 382, as reenacted in the Penal Code of June 24, 1939, P. L. 872, 18 P.S. § 4701, and explaining the difference between murder of the first and second degrees, the court stated that the true criteria and essence of murder in the first degree was the intent to kill; lacking an intent to kill it would be murder in the second degree. Although the court's explanation of the felony murder doctrine was legally correct, there was a possibility that a layman would under all the circumstances consider that, lacking an intent to kill, the verdict should be guilty of murder in the second degree. At N.T. 904, the court said, "I may say that the law and the courts recognize a distinction as to the penalty to be inflicted in murder of the first degree, and our Supreme Court is on record as stating that when a murder is committed in the course of a robbery, the death penalty, in the absence of mitigating or extenuating circumstances is, to say the least, not viewed with disfavor by the law.

In determining the question as to what the penalty shall be, in the event you convict the defendant of murder in the first degree, it will be entirely proper for you to take into consideration whether or not there are any extenuating or mitigating circumstances as to the defendant's guilt in this case.

Members of the jury, we do not wish to be understood that we express any opinion as to what your verdict shall be or what, in the event of a verdict of guilty of murder in the first degree, what the penalty shall be. That is your problem and your duty as you may conclude from the evidence and the law as we have given it to you."

Thereupon the following ensued: "Have I overlooked anything?" Mr. Achey: "Nothing for the defendant, Your Honor." After a few brief remarks by the court—Mr. Biester: "Your Honor, I may have misunderstood part of your charge, but I thought that you said that if the shooting of Kelly was unintentional, that would be murder of the second degree; that if it were during the flight from the crime it would be murder in the first degree." The Court: "I specifically stated it was completely abandoned in the case of flight or escape. That becomes important only, members of the jury, if you are convinced beyond a reasonable doubt that this shooting of Kelly did not occur during the perpetration of a robbery." Mr. Biester: "I am sorry, but I don't think that would be beyond a reasonable doubt, that it would be on the preponderance of the evidence that it was during the commission of a robbery. I think your Honor inadvertently said that they would have to believe that beyond a reasonable doubt that it was not." The Court: "If I did, that will be withdrawn." Mr. Achey: "I ask for an exception, a general exception, to the charge of the court." The Court: "Exception will be allowed." (Exception noted for defendant). It was a timely suggestion, the need of which would be apparent to any experienced trial lawyer.

District Attorney Biester was an assistant district attorney from 1932 to 1938; District Attorney from 1938 to the time in question; (appointed August 16, 1949, to fill the vacancy left by Judge

have a very wholesome effect on other young men in all vicinities who may come to realize the seriousness of the folly in which so many young men indulge in these days. The only hope of stemming the tide of such crime by youth is to enforce the law which you have indicated by your decision."

To place these remarks in their proper context: A few moments earlier in the same court room Judge Keller in discharging the remainder of the May 24 panel commended them for their satisfactory verdicts, the last one of which was an acquittal on a charge of rape. An opinion expressed by Judge Boyer in his charge as to the proper penalty was reported on June 4, Rel. Ex. No. 76.

▆▆▆ In convictions for murder the sole, absolute and final responsibility for the verdict and its consequences rests with the jury. Here no question was raised as to identity or as to the defendant's participation in the robbery. The confessions were not repudiated; the testimony was uncontradicted. In the opinion of the Supreme Court of Pennsylvania Zeitz "showed extreme callousness and brutality in his actions and his remarks during the course of the hold-up"; Com. v. Zietz, 364 Pa. at page 296, 72 A.2d at page 283; the three defendants were described as "bandits". Id. 364 Pa. at page 296, 72 A.2d at page 284. And see opinion Chief Judge Biggs, 203 F.2d at page 419, "The crime * * * admittedly committed was a brutal one, meriting severest moral condemnation * * *"; Com. v. Darcy, 362 Pa. at page 278, 66 A.2d at page 673, "Under this evidence for a jury not to have found that these men were engaged in a common law robbery would have been perverse."

Monday, June 7, court was called at 10:00 A.M. with both judges presiding. After some miscellaneous business was disposed of, the defendant was arraigned, plead not guilty, and upon Judge Keller direction selection of a jury was commenced at 10:15 A.M. As to the voir dire examination, see supra and see opinion Maris J., supra, 203 F.2d at page 423; Resp. Ex. No. 5, Par. 13, "Each juror * * * called * * * was carefully examined and cross examined * * * in order that the defendant might be tried by a jury free of bias, prejudice or preconceived opinion regarding the guilt or innocence of the accused * * *."

Defendant was represented by Webster S. Achey, Esq. and William M. Power, Esq., residents of Doylestown, engaged on defendant's behalf. Attorney Achey, at one time an Assistant United States Attorney for the Eastern District of Pennsylvania and engaged in the practice of the law for some thirty years, was one of the ablest and foremost active trial lawyers of Bucks County. His ability as such was recognized throughout the eastern section of Pennsylvania (see Resp. Ex. No. 5). In his charge the trial judge described him as "able and learned"; the Supreme Court of Pennsylvania (367 Pa. at page 133, 79 A.2d at page 786,) as "a highly reputable attorney of his own (Darcy's) choosing, eminently qualified from the standpoint of ability, experience and industry." Attorney Power "while a young man with less experience was a very good trial lawyer," (Resp. Ex. No. 5).

▆▆▆ From early March defense counsel knew that the Darcy trial would follow that of Foster and Zeitz. At no time did they make any objection to this arrangement. We assume that they were aware of current local events [52] (cf.

---

Boyer's resignation). There was obviously no need of a suggestion from outside sources.

June 15, "Observing attorneys offered the opinion that the jurist's charge was 'most fair' to the defendant." Rel. Ex. No. 102.

Following the verdict, a timely motion for a new trial was made on the sole ground of error in the admission of evidence of prior crimes.

52. June 4, Rel. Ex. Nos. 75, 76 (speculating that Darcy would plead guilty if the Foster-Zeitz verdict was life im-

N.T.–T. 260–261, they knew about the venue statute; N.T.–T. 831, and Judge Boyer's remarks of June 4). They were also then confronted with the status of the law in Pennsylvania and the pronouncement of the Pennsylvania Supreme Court in Com. v. Flood, 1930, 302 Pa. 190, at page 196, 153 A. 152, at page 153, "While defendant's right is clear, those of society are also clear; it is important that their interests should be protected against unnecessary delays. Persons accused of crimes should be brought to as speedy a trial as the exigencies of their cases demand, otherwise one of the benefits accruing to society will be lost or seriously diminished. Delays through unwarranted or unnecessary continuance should cease." Com. v. Skawinski, 1934, 313 Pa. 453, 169 A. 895, denial of application for change of venue, Act of March 18, 1875, P.L. 30, 19 P.S. § 551, and of a motion for a continuance, Com. v. Riggs, 1934, 313 Pa. 457, 169 A. 896, quite like the present situation; Com. v. Smith, 1896, 185 Pa. 553, at pages 557, 558, 40 A. 83; Com. v. Buccieri, 1893, 153 Pa. 535, at page 545, 26 A. 228, at page 232, "A very gross abuse of this discretion would have to appear." The question of change of venue is one "peculiarly within the sound judgment of the (trial) court", Id., 153 Pa. at page 546, 26 A. at page 232; Com. v. March, 1915, 248 Pa. 434, 438, 94 A. 142; Com. v. White, 1922, 271 Pa. 584, 589, 115 A. 870; Com. v. Schurtz, 1940, 337 Pa. 405, at pages 409, 410, 10 A.2d 378; Com. v. Shadduck, 1951, 168 Pa. Super. 376, 77 A.2d 673; and see Hart v. United States, 5 Cir., 1940, 112 F.2d 128, at page 131; Paschen v. United States, 7 Cir., 1934, 70 F.2d 491, at page 494,; cf. Com. v. Karmendi, 1937, 328 Pa. 321, at pages 337, 338–340, see 342 and particularly 349, 350, 351, 195 A. 62; and see our opinion in United States ex rel. Darcy v. Handy, supra, 97 F.Supp. 930, at page 935. The time and place to ascertain the existence of any disqualification was on the voir dire. See Id. 937; United States ex rel. Darcy v. Handy, 203 F.2d 407, at page 423; Com. v. Pasco, 1938, 332 Pa. 439, 2 A.2d 736; United States v. Rosenberg, 2 Cir., 1952, 200 F.2d 666, at pages 668, 669, particularly apposite; United States v. Moran, 2 Cir., 1952, 194 F.2d 623, at page 625; Allen v. United States, 7 Cir., 1925, 4 F.2d 688, at pages 695, 699; see Reynolds v. United States, 98 U.S. 145, 155, 156, 25 L.Ed. 244, "The theory of the law is that a juror who has formed an opinion cannot be impartial. Every opinion which he may entertain need not necessarily have that effect. In these days of newspaper enterprise and universal education, every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits. * * * The finding of the trial court upon that issue ought not to be set aside by a reviewing court, unless the error is manifest. * * * jurors not unfrequently seek to excuse themselves on the ground of having formed an opinion, when, on examination, it

---

prisonment; go to trial if it was death; speculation as to cost of prosecution). Rel. Ex. No. 77. June 5, Rel. Ex. No. 78 (2 items); Rel. Ex. No. 79 (a one paragraph item on p. 3, "Police official quoted as saying that, if the killers of Kelly were not given the death sentence, the electric chair should be destroyed * * *", and his opinion being agreed with by those who heard the statement). June 7, Rel. Ex. Nos. 80, 81, editorial Philadelphia Evening Bulletin, see footnote 46, supra, p. 267. June 8, Rel. Ex. No. 82, published at 1:30 P.M., reported the names of the 12 jurors selected—8 of them before adjournment on June 7—2 alternates were selected before 2:00 P.M. Rel. Ex. Nos. 83, 84, reprint of Evening Bulletin editorial of June 7. While the 4 jurors and 2 alternates selected on June 8 conceivably could have seen the Bulletin editorial of June 7—of which there is no evidence—the local paper of June 8 was not available to any of the 14. Id. as to all other newspapers, magazines, or other reading material, except the evidence, for the remainder of the trial.

turns out that no real disqualification exists. \* \* \* The affirmative of the issue is upon the challenger."

As to what constitutes disqualification of a juror, in Pa., see Com. v. Zell and Herr, 81 Pa.Super. 145, at page 148, "The presumptions are \* \* \* that all the jurors selected were \* \* \* sober, intelligent and judicious persons; \* \* \* selected from the whole county \* \* \* free from local influence or prejudice." "The law upon this subject has necessarily advanced with the changed circumstances. It has merely kept abreast of the times, and adapted itself to what the common judgment and common sense of the people see is essential to the proper administration of the criminal law. To return now to the old rule would exclude from the jurybox in many instances every man of average intelligence." Rizzolo v. Com., 1889, 126 Pa. 54, at page 72, 17 A. 520, at page 521, "Intelligent men receive impressions as to the nature and character of any transaction from what they hear and read of it, and it is not unusual to speak of these as opinions." Com. v. Crossmire, 1893, 156 Pa. 304, at page 308, 27 A. 40, at page 41. "We have held repeatedly \* \* \* that the test of the competency of a juror in a capital case is his ability to render a verdict upon the evidence, and upon the evidence alone, uninfluenced by any opinion which he may have previously formed from newspapers or other reports of the crime. \* \* \* In Allison v. Com. [99 Pa. 17], we held that, where a juror in a criminal case has formed an opinion from hearing or reading the evidence upon a former trial, he is incompetent, even if his opinion thus formed does not come up to the standard of a fixed opinion. But this rule does not apply where the juror has heard or read only fragmentary portions of the evidence; on the contrary his opinion must have been formed upon all the evidence in the former trial against the same prisoner before the disqualification referred to attaches; and it was distinctly ruled in the same case (Allison v. Com.) that hearing or reading the evidence upon a preliminary examination \* \* \* was not a trial within the meaning of this rule. We need not discuss this question further. It is worn threadbare, and the law ought to be now well understood." Com. v. Taylor, 129 Pa. 534, at pages 540, 541, 18 A. 558, "Ignorance of everything except the facts testified to by witnesses in the case on trial is not a constitutionally required qualification of American jurors." Com. v. Darcy, 362 Pa. at page 271, 66 A.2d at page 670. "\* \* \* challenge of a juror for cause is addressed to the trial judge \* \* \* much weight must be given to his judgment in passing upon it. In exercising his discretion as to the fitness of a juror to serve, he has the juror before him, and much latitude must be left to him; \* \* \* the weight to be given to the answers of a juror when examined on his voir dire is not to be determined exclusively by his words as we read them in the printed record. \* \* \* Nothing short of palpable error will justify a reversal of a trial judge in passing upon a challenge for cause." Com. v. Sushinskie, 242 Pa. 406, at pages 412, 413, 89 A. 564, at page 565.

Whether he should have moved for a continuance or a change of venue was obviously, as every lawyer knows, a matter of judgment to be decided in the light of the circumstances as measured by various considerations of trial policy. Defense counsel chose not to do so. What change any delay in the trial would have produced is pure speculation. In fact, in examining the witnesses in the Darcy trial, defense counsel on occasion referred to the testimony of the previous trial. See e. g., N.T.–T. 324–367. What of the wisdom of his choice? "It is a familiar observation that cases are better tried from the 'side lines' by lawyers who would do no better in the heat of the conflict if they conducted the trial. And of course it is easy to condemn the exercise of counsel's judgment after the case is lost which would be praised if the case were won. But no lawyer can be expected to do more than exercise a reasonable skill which cannot be fairly

judged by the result of the trial alone." Com. v. Thompson, 367 Pa. 102, at page 109, 79 A.2d 401, at page 404.

Assuming arguendo, there was some evidence of hysteria and prejudice,[53] see and cf. 203 F.2d at page 423, where Judge Maris sagely observed, " * * * a jury trial, just as every other human enterprise, is a fallible proceeding. Every juror who has ever been impaneled has been subject in greater or lesser degree to human passions and prejudices. These he is required to lay aside when he takes his oath as a juror. How successfully this is accomplished in practice has always been a matter of dispute but the deep and abiding place which the jury system has achieved in our institutions attests the fact that the standard of impartiality has normally been attained to a degree which is satisfactory to the community." And see Com. v. Buccieri, supra, 153 Pa. at page 546, 26 A. at page 233, "Indignation because of the cruelty of the deed, there doubtless was; it would be strange if such were not the case in a law-abiding community; but there is nothing which convinces us of the existence of such passion or prejudice as would prevent the twelve 'sober, intelligent, and judicious' jurors who were sworn to try the issue from rendering a true verdict on the evidence." There was some testimony as to some people being shocked; some indignant; other testimony that some people in certain parts of the county, particularly in the Feasterville area, not many overall, had ideas as to what the punishment should be. In this connection it must be remembered that Bucks County was one of the three original counties established at the first settlement of the province of Pennsylvania in 1682 (land area 617 sq. mi.; pop. 1950—144,620, 1940—107,715; pop. per sq. mi. 234.4; urban 24.1% 1950, 29.4% 1940. Pa.Manual, Vol. 91, 1953–1954, pp. 994, 997).

■ Defendant's counsel apparently made a deliberate choice not to seek delay or a change of venue. Many reasons could be suggested for their decision. We will not indulge in speculation. At all events there was a waiver of any right they may have had.

■ " * * * it * * * is for the Pennsylvania courts to say under its law what duty or discretion the court may have had. Nothing in the record impeaches the fairness and temperateness with which the trial judge [and we add the District Attorney] approached his task. His action has been affirmed by the highest court of the Commonwealth. We are not at liberty to conjecture that the trial court acted under an interpretation of the state law different from that which we might adopt and then set up our own interpretation as a basis for declaring that due process has been denied. We cannot treat a mere error of state law, if one occurred, as a denial of due process; otherwise, every erroneous decision by a state court on state law would come here as a federal constitutional question." Gryger v. Burke, 1948, 334 U.S. 728, at page 731, 68 S.Ct. 1256, at page 1257, 92 L.Ed. 1683.

---

53. The trial judge certified that there was no hysteria or prejudice either before, during or after the trial. See Resp. Ex. No. 5, Par. 18. Id. par. 23, " * * * the same conditions prevailed as in the Darcy trial, in that it was quiet, orderly, and free from any disturbance, displays of excitement, prejudice, or evidence of any emotional outbursts or hysteria whatsoever." Id. par. 24, "Although the proceedings of both of the trials of Harold Foster and Harry Zeitz and that of David Darcy were publicized through the local and county newspapers as well as Philadelphia, Trenton, and possibly some other newspapers, these reports were read and received as a matter of news by the residents of the county, and the undersigned, a resident of Doylestown, neither heard nor saw any manifestations of hysteria or prejudice having swept the town as the result of these newspaper stories. Furthermore, in view of their answers under oath during their voir dire examination, the undersigned is convinced that the jurors selected had not been influenced by any newspaper stories, radio or other news reports or by any manifestations of prejudice or hysteria against the defendant."

"If the result of the adjudicatory process is not to be set at naught, it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as a demonstrable reality." Adams v. United States ex rel. McCann, 317 U.S. 269, at page 281, 63 S.Ct. 236, at page 242, 87 L.Ed. 268. This the relator has not done.

Finally as to Judge Boyer's asserted visits to the court room. (Hon. Calvin S. Boyer was for some years District Attorney for Bucks County; later United States Attorney for the Eastern District of Pennsylvania, and from June 21, 1930 to sometime in 1949 additional law judge of the several courts of Bucks County. Rel. Ex. No. 124, p. 754). From the time of the occurrence and throughout the Foster-Zeitz trial Judge Boyer's conduct was fair and impartial. In fact, the only time his name appears in connection with the indictment was on March 1 when the court suggested the possibility of a joint trial; again on March 3 when Judge Boyer promptly complied with a request therefor naming two lawyers to represent Harold Foster. On the question of admissibility of evidence of other offenses Judge Boyer restricted the Commonwealth to a purpose narrower than that approved by the Pennsylvania Supreme Court on appeal.

By long established tradition in Bucks County, each morning and afternoon at the opening of court both judges take the bench to entertain motions and other miscellaneous matters in the Criminal, Common Pleas—law and equity—and Orphans Court. Once this work is completed, one of the judges, if engaged in a trial in that court room, remains on the bench; the other judge leaving to perform duties in another court room or in chambers. The practice used in many Pennsylvania courts, N.T.–H. 365, was continued daily no matter what court was in session or the nature of the trial, see Rel. Ex. No. 115, p. 8; not on June 4 when Judge Boyer charged the jury; and, according to Rel. Ex. No. 116, not on June 8 and 10.

The criminal docket, Rel.Ex. No. 10, a record of individual trials, shows both judges on the bench at 10:00 A.M. May 24 (p. 339); 9:30 A.M. June 2 (p. 348); 10:00 A.M. June 7 (p. 352). The court reporter's notes of testimony show only one instance of Judge Boyer taking any part whatsoever in the Darcy trial, i. e., during a sidebar discussion out of the hearing of the jury shortly after court convened on Saturday morning, June 12 (N.T. 827). Under consideration was a difficult question of law on the admissibility of evidence of other offenses (see Resp. Ex. No. 5, par. 20) in view of the Act of July 3, 1947, P.L. 1239, 19 P.S.Pa. § 711 note. Judge Boyer indicated his thinking on the matter. Upon objection by counsel [54] the discussion ended; Judge Keller ruled; Judge Boyer left the bench shortly after and did not return during the remainder of the trial.[55] It may be that during the Fos-

54. "Judge Boyer: That applies only to cross examination.

Mr. Achey: I object to Judge Boyer sitting in on this case. I don't mind trying against one judge—

Judge Boyer: The judges reserve the right to confer without being obliged to get the consent of defense counsel.

Mr. Achey: In view of the statement which Judge Boyer made to the jury in the trial of Foster and Zeitz, which was tried last week, I submit that he has disqualified himself from sitting in on this case, and it is prejudicial to the defendant. My objection, further, to the offer, is that the evidence of the commis-sion of other crimes is not permissible in this particular case because it is restricted by the amendment of the Act of 1947.

The Court: The objection is overruled. (Objection noted for defendant)."

End of sidebar, N.T. 831. Any statements made at sidebar were unknown and never called to the attention of the jury. Resp. Ex. No. 5, par. 21.

55. The statements were admitted for a more limited purpose than the Supreme Court of Pennsylvania approved on appeal. See Com. v. Darcy, 362 Pa. at page 283, 66 A.2d at page 675.

ter-Zeitz trial Judge Keller shortly after 9:30 A.M. June 2 (cf. Rel. Ex. No. 1, N.T. 1194) listened to but did not express any opinion during a similar discussion.[56]

Honorable Hiram H. Keller, president judge since April 30, 1930, who presided with eminent fairness throughout the trial, has certified (Resp. Ex. No. 5, par. 20–21) that after the miscellaneous business was completed, "On several occasions * * * Judge Boyer remained for brief periods while evidence was presented * * *", and that with the exception of the incident reported at N.T.–T. 831, "At no other time, during the course of the trial, did Judge Boyer assist, volunteer to assist, or make any suggestions to or otherwise aid the undersigned in the trial of this case."

The District Attorney, now Judge Biester, testified, and we find as a fact, that Judge Boyer did not at any time during the Darcy trial assist, attempt to assist, make any suggestion to or in any other manner aid the Commonwealth in the prosecution of the case against David Darcy; that Judge Boyer did not pass any note or message of any kind to the District Attorney in connection with the trial for the use of the District Attorney or Judge Keller.

On several occasions during the Darcy trial—not on Friday evening or during the charge of the court on Monday, June 14—Judge Boyer sat for brief intervals on a chair just inside the court room door from the judges' chambers, apparently listening to the proceedings. On several occasions during the Foster-Zeitz trial, Judge Keller sat for short intervals in the same area; (the judges in Bucks County did not at that time wear robes).

During the Darcy trial Judge Boyer did not at any time sit at or near the table reserved for the press; at or near the table reserved for the District Attorney; at no time time did Judge Boyer sit on a chair next to or anywhere near a chair occupied by the District Attorney.

Throughout the trial, the only chairs occupied by the District Attorney or his assistant were at the table reserved for that purpose, or in chairs immediately in front of the table reserved for the press.

At no time other than that noted in N.T.–T. 830 did Judge Boyer take any part whatsoever in the proceedings of the Darcy trial.[57]

Friday, June 12, Judge Boyer in sentencing Robert White, 18, one of three Philadelphia youths, for stealing a car radio, to four to twelve months, was reported (Rel. Ex. No. 94) to have said: "We don't propose to nail all our property fast here in Bucks County just because thieves from Philadelphia want to pick up everything which isn't being watched * * * What business did you have to come up here in the first place? * * * So far as your testimony is concerned, you have not shown any excuse at all to come out of Philadelphia to Bucks County. * * * Have you heard what's going on downstairs? Do you want to end up like that?"—" 'I'd like to have another chance', said the youth whose mother described him as a 'good boy'." "We in Bucks County are tired of you Philadelphians who don't know how to behave. We have to bear the expense

---

56. As to other criminal matters between May 24–June 15; see Ex. Nos. 115, 137, a number of cases before Judge Keller May 24 to 27 and June 1 to 4 incl.; a number of defendants, one of whom was Robert White, before Judge Boyer June 11.

57. Before the closing pleas in the Foster-Zeitz case Judge Boyer did not say, "Now we will be able to start the Darcy case next week". He did not tell school children—with the jury present—that the defendants were going to be convicted of murder. See N.T.–H. 759, 918 and 382. Judge Boyer did not discuss the pending case or the defendants with the witness Davis. N.T.–H. 430 et seq. Credibility is for a trier of the facts. See Hawk v. Olson, 326 U.S. 271, at page 279, 66 S.Ct. 116, 90 L.Ed. 61.

and we propose to stop it." Said Judge Boyer, "Unless you get an entirely different idea or conception of what belongs to you and respect for other people's property you will have a sorry life." If one recalls the arrest on February 16 of six young Philadelphians on serious charges (see note 46, supra, 130 F.Supp. 287, 288), making ten youngsters in the County Prison at that time, and the arrest of the three in question on June 5, Judge Boyer's remarks may be appraised in a different light than one of condemnation. The sentence was moderate under the circumstances. At all events the sentence was passed and the remarks made in a court room other than that in which the Darcy trial was progressing. The jurors in the Darcy trial knew nothing whatsoever as to the sentence and the remarks. What occurred could not possibly have, and did not in fact have, any effect whatsoever on the outcome of the Darcy trial. It did not reflect in any manner hysteria or prejudice on Judge Boyer's part toward any of the four defendants charged with murder.

After the verdict in the Darcy trial was recorded and the jurors dismissed with the thanks of the court, there was no display of any kind in or outside the court room.[58] It was reported (Rel.Ex. No. 102) that as the spectators left the court house there was widespread comment approving the verdict and the efficient manner in which the Commonwealth had prepared its case; "They seemed to 'pity the parents; not the defendants' in this case".

The respondent moves to dismiss on the ground that the evidence is insufficient in quality and quantity to support the allegations of the petition.

▉▉▉ After "in a sense" traversing the highways and byways of Bucks Coun-

ty; spending long hours in its newspaper columns, and on the editorial and other pages; listening to reports as to the sentiments of its people in Doylestown and throughout the county (see amendment of the petition, N.T.–H. 393), fully aware of its long tradition as a law abiding community; pondering on the results in the light of Section IX of Article 1 of the Pennsylvania Constitution and Section I of the Fourteenth Amendment of the United States Constitution, we have fully and completely complied with the mandate of the Court of Appeals. With what result? Only to be more confirmed in our conclusions expressed in our opinion on May 17, 1951, that the defendant was afforded in form and in substance a fair and impartial trial in the Court of Oyer and Terminer in Bucks County, Pennsylvania, in June 1948; that the allegations of the petition for habeas corpus are without support in the record and in the evidence; that the defendant was afforded due process of law under the Constitution of Pennsylvania and the Constitution of the United States.

There is nothing here akin to Shepherd v. Florida, 341 U.S. 50, 51, 71 S.Ct. 549, 95 L.Ed. 740; Frank v. Magnum, 237 U.S. 309, at page 335, 35 S.Ct. 582, 59 L.Ed. 969; Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543; see Ashe v. United States ex rel. Valotta, 270 U.S. 424, 426, 46 S.Ct. 333, 70 L.Ed. 662, and see Stroble v. California, 343 U.S. 181, at pages 193, 194, 72 S.Ct. 599, 96 L.Ed. 872; Buchalter v. New York, 319 U.S. 427, at page 430, 63 S.Ct. 1129, 87 L.Ed. 1492; United States v. Rosenberg, 2 Cir., 200 F.2d 666.

As Mr. Justice Cardozo said in Snyder v. Massachusetts, 291 U.S. 97, at page 122, 54 S.Ct. 330, at page 338, 78 L.Ed.

---

58. June 8, Rel. Ex. No. 82, June 11 Rel. Ex. No. 91, June 12 Rel. Ex. No. 94, reported efforts of defense counsel to keep evidence of other offenses from the jury. June 10, Rel. Ex. No. 90, see note 46, supra 130 F.Supp. 286 at page 288, an editorial praising the Foster-Zeitz verdict; June 12, Rel. Ex. No. 94, a news item as to a friend of Darcy's being arrested on

his way to the trial; June 14, Rel. Ex. No. 98, awaiting verdict; June 15, Rel. Ex. No. 101, report on verdict; suicide rumor false, Rel. Ex. No. 102, speculation on cost of prosecution. And see "Bucks County justice" as a term of approval. June 17, Rel. Ex. No. 103, in re possibility of error in rulings in murder trial.

674, "But justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true. \* \* \* There is danger that the criminal law will be brought into contempt—that discredit will even touch the great immunities assured by the Fourteenth Amendment—if gossamer possibilities of prejudice to a defendant are to nullify a sentence pronounced by a court of competent jurisdiction in obedience to local law, and set the guilty free."

The findings of fact and conclusions of law submitted by relator and respondent as are in agreement with this opinion are hereby adopted and affirmed. Such findings of fact and conclusions of law submitted by the relator and respondent as are in disagreement with our opinion are hereby denied.

The petition for a writ of habeas corpus will therefore be denied; our stay order heretofore entered on November 5, 1953, will be terminated and come to an end.

The Commonwealth of Pennsylvania so far as this court is concerned is free to pursue the proper legal processes to see that the sentence and judgment of the Court of Oyer and Terminer of Bucks County be carried out.

WATSON, C. J., joins in all the views expressed in this opinion.

## Appendix

As to respondent's request for findings of fact: Affirmed—No. 1, ante, p. 262; No. 2, ante, pp. 261–262; No. 3, ante, p. 263, proper date May 27; No. 4, ante, p. 262, see Slaughter incident, note 29; No. 5, ante, p. 263, note 34; No. 6, ante, p. 263; Nos. 8, 9, 10, 11, 12, 13, ante, p. 264; No. 14 as modified, ante, pp. 264–266; Nos. 15 and 16, ante, p. 264; No. 17; No. 18 as modified, ante, pp. 272, 275, 276; No. 19, ante, p. 276; No. 20, ante, p. 275; No. 21, ante, pp. 276, ——; No. 22, ante, p. 276; No. 23, ante, p. 276. Denied—No. 7 as stated, ante, p. 263.

As to respondent's request for conclusions of law: Nos. 1 to 6 inclusive are denied; No. 7 affirmed; No. 8 affirmed as modified.

As to relator's request for findings of fact: No. 1 affirmed as amplified, ante, pp. 259, 260; Nos. 2, 3, 4, denied, ante, p. 266; Nos. 5, 6, affirmed as modified, ante, p. 266; Nos. 7, 8, affirmed, ante, p. 266; No. 9, denied; No. 10 denied, ante, pp. 266–269; No. 10a, affirmed as modified and in context; (b) affirmed in context; (c) affirmed in context, ante, pp. 267–269 et seq., notes 46 and 47; (d) affirmed as to heading, details of crime not repeated; (e) affirmed ante, p. 267; (f) affirmed in part, denied as to details; (g) denied as stated, ante, p. 267; (h) denied as stated, affirmed as to quotes; (i) affirmed in context; (j) denied as stated, item misquoted, ante, p. 269, note 47; (k) denied as stated, ante, p. 269; (l) denied, ante, p. 269; (m) denied as stated; (n) Ex. 31 denied as stated, title misquoted, ante, p. 267, affirmed as to Ex. 30; (o) possibly misleading interpretation, defendants cases not mentioned; (p) denied, misleading and misquoted, correct as to heading of news item, ante, p. 267; (q) denied as stated; (r) denied as stated, ante, p. 267, affirmed as to Ex. 39; (s) misquoted, see ante, pp. 267, 268; (t) denied, ante, p. 268; (u) denied; (v) a twelve line news item; (w) affirmed, ante, p. 268; (x) conclusions denied; (y) misquoted, ante, p. 268; (z) denied, ante, p. 268; (aa) (cc) (dd) names of jurors only; (bb) substantially correct, ante, p. 262, note 27; No. 11 denied as stated, see ante, p. 266 as to coverage; No. 12 misquoted in part, ante, p. 271; No. 13, quotes correct, one juror selected before noon; No. 14 denied, ante, p. 266, note 44; No. 15 denied, misquoted, ante, p. 266, note 44; No. 16 denied; Nos. 17, 18 denied, ante, pp. 264, 265, note 40; No. 19 denied, ante, p. 265; No. 20, denied; Nos. 21, 21a denied, ante, p. 264, note 39; No. 22 denied, ante, pp. 261, 275; No. 23 affirmed; No. 24, Ex. 51 misquoted, Ex. Nos. 55, 58 affirmed, but see ante, p. 262, note 27; No. 25 denied as stated; No. 26 denied as stated,

ante, p. 269, note 47; No. 27 denied; Nos. 28, 29, affirmed; Nos. 30, 31 denied, ante, p. 262; No. 32 affirmed, ante, p. 263, note 33; No. 33 denied; No. 34 denied, ante, p. 275; No. 35 denied, ante, pp. 261, 275; No. 36 affirmed, ante, p. 271 et seq.; No. 37 denied as stated ante, p. 276; No. 38 denied, see ante, p. 275 et seq.; No. 39 denied, see ante, p. 276, note 57; No. 39a denied, ante, p. 276; No. 40 denied, ante, pp. 275–276 et seq.; No. 41 denied, ante, p. 275; Nos. 42, 43 denied, ante, p. 276; No. 44 denied, ante, pp. 276, 271; Nos. 45, 46 denied, ante, p. 275 et seq.; No. 47 denied, ante, p. 275 et seq., and see ante, p. 269, note 46; No. 48 denied, ante, pp. 264 and 265, note 40; No. 49 denied, ante, p. 263, notes 33, 34; No. 50 affirmed, ante, p. 263, note 31; Nos. 51, 52, 53 denied, ante, pp. 263, 272, 273; No. 54, 54a, 54b denied.

As to relator's request for conclusions of law; Nos. 1, 2, 3 denied; No. 4 denied as stated; Nos. 5, 6, 7, 8, 9, 10 denied.